IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 108,963

BETTY A. BORN, as Trustee of the JOHN H. BORN, JR. REVOCABLE TRUST,
and The JOHN H. BORN, JR. REVOCABLE TRUST,
*Appellants/Cross-Appellees*,

v.

SHARON L. BORN,
*Appellee/Cross-Appellant*,

and

TODD J. BORN AND JANEL M. BORN,
Co-Trustees of the TODD J. BORN REVOCABLE TRUST,
*Intervenors/Appellees/Cross-Appellants*.

SYLLABUS BY THE COURT

1.

Summary judgment is only appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The district court must resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought.

2.

The interpretation of statutes and written contracts is a question of law over which this court exercises unlimited review, unaffected by the lower courts' interpretations or rulings.

1

3.

Article 9 of the Uniform Commercial Code, K.S.A. 84-9-101 *et seq.*, applies to any transaction, regardless of its form, that creates a security interest in personal property or fixtures by contract.

4.

K.S.A. 2013 Supp. 84-9-620 governs the circumstances under which a secured party may accept collateral in full or partial satisfaction of the obligation it secures. A secured party proposing to accept collateral under K.S.A. 2013 Supp. 84-9-620 can do so "only if" the debtor consents to the acceptance or the secured party does not receive an authenticated objection to the proposal within 20 days of giving the debtor or obligor notice of the proposal.

5.

The remedy described in K.S.A. 2013 Supp. 84-9-620 is also known as a strict foreclosure, which is defined as a procedure by which the secured party acquires the debtor's interest in the collateral without the need for a sale or other disposition. Where the collateral is accepted in full satisfaction of the debt, the secured party effectively waives its right to a deficiency and the debtor waives its right to any surplus.

6.

The acceptance or retention of collateral is a permissive, not mandatory remedy. A debtor cannot force a secured creditor to accept the property in satisfaction of the debt; a debtor must consent to the secured party's decision to strictly foreclose upon the collateral. The provisions of K.S.A. 2013 Supp. 84-9-620 do not include an additional requirement that the debtor redeem the collateral under K.S.A. 2013 Supp. 84-9-623 in order for the debtor's effective objection to preclude a secured party's proposed strict foreclosure.

2

7.

K.S.A. 2013 Supp. 84-9-602 provides that a debtor or obligor may not waive or vary the rules stated in K.S.A. 2013 Supp. 84-9-620 to the extent that the rules give rights to a debtor or obligor and impose duties on a secured party. Accordingly, a debtor or obligor cannot, by contract or otherwise, vary the rule that gives a debtor or obligor the right to preclude the secured party's acceptance of collateral through an authenticated and timely objection.

8.

A promissory note and a security agreement are designed to perform separate functions. A note governs the manner and method of the repayment of the debt, whereas the security agreement governs the disposition of the collateral pledged to assure the performance of the debtor under the note. A secured party, *i.e.*, a person who has loaned money and secured collateral to assure repayment, has the option to forego a pursuit of his or her interest in the collateral under the security agreement and, instead, assert his or right to repayment under the promissory note.

9.

If tender of payment of an amount due on a promissory note is made to a person entitled to enforce the instrument, the obligation of the debtor or obligor to pay interest after the due date on the amount tendered is discharged.

10.

The debtor on a promissory note secured by individually-pledged collateral is entitled to have the note indebtedness reduced by the value of collateral that one of the pledging individuals transfers to the lender pursuant to a strict foreclosure proposal.

Review of the judgment of the Court of Appeals in an unpublished opinion filed March 14, (2014). Appeal from Sedgwick District Court; ANTHONY J. POWELL, judge. Opinion filed June 10, 2016. Judgment of the Court of Appeals affirming the district court is reversed and remanded with directions. Judgment of the district court is reversed.

*James A. Walker*, of Triplett, Woolf & Garretson, LLC, of Wichita, argued the cause, and *Shane A. Rosson*, of the same firm, was with him on the briefs for appellants/cross-appellees.

*Todd E. Shadid*, of Klenda Austerman LLC, of Wichita, argued the cause and was on the brief for appellee/cross-appellant Sharon L. Born.

The opinion of the court was delivered by

JOHNSON, J.: Betty Born (Betty), in her capacity as a trustee of the inter vivos, revocable trust created with her late husband, John H. Born, Jr. (John), hereafter referred to as "the Born Trust," brought this injunctive and declaratory judgment action against Sharon Born (Sharon). Sharon held two installment promissory notes upon which the Born Trust assets had been pledged as security when John died. When Betty attempted to make payments on the notes, Sharon took the position that the notes were in default because of John's death; that, pursuant to the notes' acceleration clauses, the entire remaining balances were immediately due and payable; and that Sharon's only remedy under the security agreements was to accept all of the Born Trust's pledged assets in full satisfaction of the note balances. This action challenged Sharon's right to unilaterally effect an acceptance-of-collateral remedy.

The district court granted summary judgment in favor of Sharon, finding that the Born Trust had failed to properly object to Sharon's acceptance of the collateral in full satisfaction of the notes and that the Born Trust had failed to properly redeem the collateral after being notified that Sharon had accepted it. The district court therefore ordered the Born Trust to turn over the collateral to Sharon.

4

The Court of Appeals affirmed the district court. The panel found that, although the Born Trust did properly object to Sharon's proposed acceptance of collateral, the Uniform Commercial Code (UCC) required that the trust also redeem the collateral. The panel determined that the Born Trust had not effectively attempted to redeem the collateral, so that the district court's result could be affirmed. *Born v. Born*, No. 108,963, 2014 WL 1096602, at *14 (Kan. App. 2014) (unpublished opinion).

This court granted the Born Trust's petition for review of the Court of Appeals' decision. Finding that the Born Trust had the right under the promissory notes to pay the accelerated balances due thereon to prevent Sharon's acceptance of the pledged assets under the security agreement, we reverse both the Court of Appeals and the district court. The matter is remanded to the district court to calculate the amount due on the notes at the time they were accelerated, and upon payment of that amount, to order the release of Sharon's lien on the Born Trust assets.

FACTUAL AND PROCEDURAL OVERVIEW

The promissory notes and security agreements at issue in this case were executed in connection with the sale of a business interest; the persons involved in the sale and this lawsuit are related by blood or marriage. At the time of the sale, John owned a successful stone mason company. His cousin, Sharon, owned all but nine shares of H.J. Born Stone, Inc. (Born Stone, Inc.), a family corporation that had owned and operated a stone and quarry business since 1949. Sharon's son, Todd Born (Todd), held the other nine shares of Born Stone, Inc., stock and was employed by the corporation.

In September 2010, the cousins reached an agreement for John to purchase a majority interest in the stone and quarry business, which would then be operated jointly

5

by John and Todd. The transaction was structured to include both an asset purchase and a stock purchase.

First, the Born Trust and Todd formed a separate company, TJ Leasing, LLC (TJ Leasing), to be used to purchase certain equipment, vehicles, and real estate from Born Stone, Inc. The Born Trust's membership interest in TJ Leasing was 51%; Todd owned 49%. Although Todd later transferred his interest in TJ Leasing to the Todd J. Born Revocable Trust, we will refer to his interest as individually owned to avoid further confusion.

TJ Leasing paid Born Stone, Inc., for the purchased assets by executing a "Purchase Price Note" for the full purchase price of $825,877, together with annual interest to be calculated each year pursuant to a formula. By the terms of the note, TJ Leasing, as "Borrower," was to pay H.J. Born Stone, Inc., as "Lender," annual payments of $50,000, until the note was paid in full. The payments were due each September 30, beginning in 2011. Although the Court of Appeals' opinion referred to this instrument as "Note 1," we will refer to it more descriptively as the "TJ Leasing note." As collateral for the TJ Leasing note, Todd and the Born Trust executed a Pledge Agreement, granting Born Stone, Inc., a security interest in and to all of their ownership interests in TJ Leasing. We will refer to this instrument as the "TJ Leasing security agreement."

The day before the September 30, 2010, effective date of the TJ Leasing note, Sharon resigned as an officer and director of Born Stone, Inc. Then, on the same date as the asset sale to TJ Leasing, Born Stone, Inc., used the sale proceeds, along with other remaining corporate assets, to fund the repurchase of 144 shares of Sharon's Born Stone, Inc., stock, pursuant to a Stock Redemption Agreement. The corporation partially paid for the stock redemption by giving Sharon a written assignment of its interests and rights in and to the TJ Leasing note and TJ Leasing security interest. In other words, Sharon

6

became the holder of those instruments, assuming the rights and obligations of Born Stone, Inc. After the stock redemption on September 30, 2010, Born Stone, Inc., had 194 shares outstanding; Sharon owned 185 shares and Todd owned 9 shares.

The following day, October 1, 2010, the Born Trust obtained one-half of the outstanding shares of Born Stone, Inc., by purchasing 97 shares from Sharon. The Born Trust paid for the stock purchase by executing an installment promissory note ("Stock Purchase Note") in the principal amount of $708,300, together with interest, payable to Sharon in annual payments of $50,000, due on September 30 of each year, beginning in 2011. To secure those payments, the Born Trust, by written agreement hereafter referred to as "stock security agreement," pledged its Born Stone, Inc., stock as collateral. That same day, Sharon gifted her remaining 88 shares of Born Stone stock to Todd, which resulted in Todd and John both holding 97 shares of Born Stone stock.

Unusual events ensued. Shortly after the sales transactions, John was diagnosed with terminal cancer. He informed Sharon of his diagnosis and kept her apprised of his medical condition. In April 2011, Sharon requested and received a lump sum payment of $375,000 from TJ Leasing so that she could pay her income taxes. That voluntary lump sum payment within the first 6 months of the TJ Leasing note reduced its principal amount by approximately 45%. In June 2011, Todd sold 1.94 shares of his Born Stone, Inc., stock to the Born Trust for $14,166, which made the Born Trust's interest in Born Stone, Inc., 51% and left Todd with 49% ownership, the same proportional ownership as it held in TJ Leasing. Then, on September 8, 2011, approximately 3 weeks before the first annual payments were due on the two notes, John died.

On or about September 19, 2011, Betty contacted Sharon in an attempt to make the annual payment on both notes, but Sharon avoided the attempt, claiming she was busy. Instead, 2 days later, on September 21 (9 days before the due date of the first

7

annual installment), Sharon's attorney hand-delivered two letters to Betty in her capacity as trustee of the Born Trust. One letter addressed the September 30, 2010, TJ Leasing note and security agreement; the other referenced the October 1, 2010, documents. In both letters, Sharon made the following declaration and notification, with the addition of parenthetically describing the collateral for each note:

> "As a result of the death of John H. Born, Jr., I, pursuant to paragraph 3 of the Note, declared the entire balance of the Note in default and immediately due and payable. Pursuant to paragraph 4 of the Pledge Agreement, this letter is notice to the John H. Born, Jr. Revocable Trust, as restated and amended u/a/d December 15, 2005, that I have accepted the Collateral listed in the Pledge Agreement."

Additionally, in the TJ Leasing note and security agreement letter, Sharon made the following declaration: "As a result, all of the membership interest in TJ Leasing, LLC, held by the John H. Born, Jr. Revocable Trust, as restated and amended u/a/d December 15, 2005, is forfeited, ceased to exist and terminated." Sharon then directed Betty to "immediately surrender the trust's original Unit Membership Certificate of TJ Leasing, LLC, to my attorney, Todd E. Shadid," at his Wichita office address.

Sharon sent a similar letter to her son, Todd, instructing him to surrender his original Unit Membership Certificate of TJ Leasing to her. Todd complied with his mother's demand, forfeiting his 49% interest in TJ Leasing to her.

The letter to Betty declaring a default under the Stock Purchase Note and security agreement, included the additional declaration: "As a result, all of interest [*sic*] of the trust as stockholder in H.J. Bron [*sic*] Stone, Inc. is forfeited, ceased to exist and terminated." That letter demanded that Betty "immediately surrender the trust's original Stock Certificate(s) for H.J. Born Stone, Inc., to my attorney, Todd E. Shadid," at his Wichita office address.

8

The day after Sharon's attorney hand-delivered the above-described letters to Betty, the Born Trust's attorney contacted Sharon's attorney to arrange payment of the entire remaining balances on the notes. Sharon's attorney responded with the statement that Sharon would refuse to accept payment. Further, he confirmed that Todd had surrendered his interest in TJ Leasing to Sharon, albeit Sharon apparently did not credit the TJ Leasing note with any value for the relinquished collateral.

The next day, September 23, 2011, the Born Trust's attorney followed up with a letter to Sharon's attorney confirming that the Born Trust had agreed to pay Sharon the total amounts then due under both accelerated notes but stating that "you and your client are taking the absurd position that once your client declares a default under the Promissory Notes, our clients have no rights to immediately make payments to remedy the defaults." The letter further alleged that Sharon failed to act in good faith when: (1) she refused to meet with Betty on or about September 19, 2011, to accept payment in full on the notes; (2) she declared default on the notes 2 days later; and (3) she refused to accept full payment on the notes on September 22, 2011. The letter advised that pursuant to K.S.A. (2011 Supp.) 84-9-625, the Born Trust was filing a lawsuit seeking an injunction to prevent Sharon from taking possession and ownership of the collateral and a declaratory judgment requiring Sharon to accept payment in full from the Born Trust in satisfaction of the promissory notes.

That same day, September 23, 2011, the Born Trust filed the lawsuit against Sharon, alleging that by declaring default and demanding immediate surrender of the collateral, Sharon had breached the terms of the notes and security agreements and had violated provisions of the Uniform Commercial Code, specifically K.S.A. 2011 Supp. 84-9-607(c), K.S.A. 2011 Supp. 84-9-625, and K.S.A. 2011 Supp. 84-1-304. The Born Trust asked the court to enter an order restraining Sharon from: (1) any further violation of the

9

law, (2) undertaking any collection efforts against the Born Trust, (3) taking any ownership interest of the Stock Certificates and Unit Membership Certificates, (4) exercising any authority or control over Born Stone, Inc., or TJ Leasing, (5) exercising any stockholder rights in Born Stone, Inc., or member rights in TJ Leasing, and (6) entering into any contracts on behalf of Born Stone, Inc., or TJ Leasing or acting as an agent of either company.

On September 26, 2011, Sharon's attorney e-mailed a letter to the Born Trust's attorney, arguing that an intent to tender payment did not constitute an actual tender of payment, which was required even if Sharon would reject any such tender. The letter alleged that Betty had not offered to meet with Sharon on September 19 to pay all amounts owed under the notes, but rather the purpose of the meeting was to pay the $50,000 annual installments that were coming due under the notes. The attorney's letter further alleged that Betty had informed Sharon that Betty could not pay the full amount due on the notes until sometime in the future after she received the proceeds from John's life insurance policy. Finally, the attorney opined that pursuant to the clear and unambiguous terms of the notes and security agreements, Sharon was not required to accept any payments from the Born Trust.

On September 27, 2011, the district court entered a temporary restraining order mandating that the operation and management structure of Born Stone and TJ Leasing maintain their status quo; prohibiting the sale, transfer, or encumbrance of company assets; and prohibiting the sale, transfer, or encumbrance of Born Stone Stock or TJ Leasing membership interests.

On September 28, 2011, the Born Trust caused a certified check in the amount of $964,144.87 to be hand-delivered to Sharon's counsel, along with a letter stating: "This check should satisfy all amounts due under the contracts." Although not explained at the

10

time, the amount tendered was calculated as the total amount of principal and interest due and owing under both notes as of September 29, 2011, after taking into account the April 8, 2011, payment of $375,000 on the TJ Leasing note and deducting 49% of the remaining principal balance of the TJ Leasing note to reflect Todd's transfer to Sharon of his 49% ownership interest in TJ Leasing.

On September 30, 2011, Sharon's attorney returned the check, stating: "I am in receipt of your client's actual tender of payment, and as stated before, it is rejected." The letter continued to set forth Sharon's position; namely, that she did not need to declare a default, that John's death constituted an automatic default, that she only needed to declare that the notes' balances were accelerated, and that her only remedy in the event of the default was to accept the collateral.

Todd's Trust filed a motion to intervene in the lawsuit on October 11, 2011, and the motion was subsequently granted.

On October 31, 2011, Sharon filed a second amended answer and counterclaim seeking a declaratory judgment that (1) immediately upon the death of John, Sharon properly and rightfully declared due the entire amounts owed under the notes; (2) upon John's death, Sharon had the right to vote all of the membership interest in TJ Leasing and 97 shares of Born Stone; (3) Sharon properly notified the Born Trust of her acceptance of the collateral under the security agreements; (4) Sharon is the lawful owner of all membership interest in TJ Leasing and the 97 shares of Born Stone stock; and (5) the Born Trust has no further liability under the notes and security agreements. In the alternative, Sharon requested that if the notes and security agreements could not be enforced as written, the agreements should be reformed to carry out the parties' intent, or the agreements should be rescinded and the parties returned to their original position.

11

A restraining order was filed on November 15, 2011, wherein the parties agreed that the operations and management structure of Born Stone and TJ Leasing would maintain their status quo and no other substantive actions would be taken by either company without written agreement by the lawsuit's parties or court order.

The Born Trust also filed a motion for leave to amend its petition, which was subsequently granted. The amended petition added a count for declaratory judgment asking the court to find: (1) that the Born Trust was entitled to a reasonable amount of time to pay the balance of each note before Sharon could accept the collateral; (2) that Todd's surrender of his membership interest in TJ Leasing, and Sharon's acceptance of the same, satisfied 49% of the balance of the TJ Leasing note; (3) that the Born Trust's tender of the total amount due under both notes was reasonable and timely; (4) that Sharon's purported acceptance of the collateral was ineffective; (5) that the Born Trust remains the owner of 98.94 shares of Born Stone stock; and (6) that Sharon's remedy is acceptance of the amount previously tendered for each note as payment in full.

The Born Trust and Sharon subsequently filed competing motions for summary judgment, with Todd's Trust joining Sharon's motion. The district court granted summary judgment to Sharon, finding that the Born Trust had not formally objected to Sharon's notice of acceptance of the collateral and that the Born Trust had not tendered payment in fulfillment of all its obligations under the notes. The district court therefore directed the Born Trust to turn over its 97 shares of Born Stone stock and all of its membership interest in TJ Leasing to Sharon.

The Born Trust filed a motion for reconsideration, which the district court denied. But the district court did clarify that John's death did not trigger an option for Born Stone or its stockholders to purchase the 1.94 shares of Born Stone stock that had been previously purchased from Todd. As such, the district court held that the 1.94 shares of

Born Stone stock properly passed to John's heirs. The Born Trust appealed the district court's initial ruling, and Sharon cross-appealed the district court's ruling with regard to the 1.94 shares of Born Stone stock.

*Court of Appeals Decision*

To the Court of Appeals, the Born Trust raised five issues, asserting that (1) for multiple reasons, the district court erred in holding that Sharon had properly accepted the collateral under K.S.A. 2013 Supp. 84-9-620(a); (2) the written agreements clearly provided that the Born Trust had a reasonable amount of time to pay the balance of the notes after John's death and before Sharon's acceptance of the collateral; (3) Sharon waived or relinquished her right to demand prompt payment of the notes; (4) Sharon's acceptance of 49% of the collateral under the TJ Leasing security agreement should have reduced the amount required to be tendered by the Born Trust; and (5) the district court erred in holding that the Born Trust's tender did not redeem the collateral secured by the TJ Leasing security agreement.

In response, Sharon argued that her acceptance of the collateral was in conformance with K.S.A. 2013 Supp. 84-9-620; that the district court correctly held that Sharon's acceptance of the collateral was effective unless the Born Trust timely objected *and* timely redeemed the collateral; and that the district court correctly held that the Born Trust failed to timely object and redeem the collateral. Finally, Sharon argued that the district court erred in holding that the Born Trust's transfer of the 1.94 shares of Born Stone stock was a permitted transfer.

In affirming the district court, the Court of Appeals first held that the parties' agreements were subject to the UCC, which contains specific provisions relating to a secured party's options upon default. *Born*, 2014 WL 1096602, at *6. Critical to its

ultimate holding, the panel then found that the terms of the sales limited Sharon's remedy upon default to accepting the secured collateral and that the UCC regulates the manner in which a secured party may accept collateral. 2014 WL 1096602, at *7. The Court of Appeals correctly noted that the acceptance of collateral procedure may not be waived. 2014 WL 1096602, at *7.

The Court of Appeals then found that Sharon's September 21, 2011, letters constituted valid proposals to accept the collateral pursuant to K.S.A. 2013 Supp. 84-9-620. 2014 WL 1096602, at *9. Citing to K.S.A. 2013 Supp. 84-9-102(a)(66), the provision defining "proposal," the Court of Appeals determined that Sharon's proposal need only to manifest her intent to accept the collateral in full satisfaction of the Born Trust's obligations, and Sharon's September 21, 2011, letters clearly manifested that intent. 2014 WL 1096602, at *8. The Court of Appeals further reasoned that the UCC did not require the secured party to notify the debtor of its right to object or notify the debtor of the amount due under the debt instrument. 2014 WL 1096602, at *9.

Contrary to the district court's finding, the Court of Appeals held that the Born Trust did, in fact, object to Sharon's acceptance of the collateral. 2014 WL 1096602, at *10. The panel reasoned that because Sharon's only remedy under the agreements was to accept the collateral, an event of default

> "could result in one of only two outcomes:  (1) Sharon could accept the collateral in satisfaction of the Born Trust's obligations on the Notes or (2) the Born Trust could object and redeem the collateral under K.S.A. 2013 Supp. 84-9-623. Therefore, the district court correctly determined that in order to prevent Sharon from accepting the collateral, the Born Trust had to both timely object to Sharon's proposal *and* redeem the collateral." 2014 WL 1096602, at *10.

14

The Court of Appeals concluded that the Born Trust failed to redeem the collateral because it did not make a "full tender of the entire obligation due under the Notes." 2014 WL 1096602, at *11.

In reaching this decision, the Court of Appeals rejected the Born Trust's argument that Sharon's refusal to accept payment constituted a waiver of its obligation to tender because the payment would have been futile. The Court of Appeals reasoned that because the debtor's right to redeem is absolute and cannot be waived, "regardless of Sharon's position, the Born Trust could have redeemed the collateral if it had actually tendered payment of the outstanding balance of the Notes in full." 2014 WL 1096602, at *12. In addition, the Court of Appeals found that Sharon did not, in fact, waive the Born Trust's obligation to tender; but instead, Sharon's counsel repeatedly advised the Born Trust's counsel that actual tender was necessary. Finally, the Court of Appeals rationalized that the Born Trust's attempt to tender the partial amount due, as well as its repeated statements that it intended to tender the total amount due, established "that the Born Trust was aware of its obligation under K.S.A. 2013 Supp. 84-9-623(b)." 2014 WL 1096602, at *12.

The Court of Appeals also rejected the Born Trust's argument that partial tender was sufficient, finding that the plain language of the TJ Leasing security agreement and the provisions of the UCC did not permit partial payment or partial surrender under the facts of this case. 2014 WL 1096602, at *13. Similarly, the panel rejected the Born Trust's argument that the partial tender completely satisfied the obligations secured by the Stock Purchase Note because the evidence indicated that the parties intended that all of the agreements were part of one transaction and that when making its tender, the Born Trust expressly stated that the check should satisfy all amounts due under the contracts. 2014 WL 1096602, at *14.

15

The Court of Appeals concluded that under the terms of the parties' agreements, Sharon's sole remedy was to accept the collateral, that Sharon did not waive her right to payment under the notes, and the Born Trust did not follow the steps to properly redeem the collateral because it did not tender fulfillment of all obligations secured by the collateral. As such, the Court of Appeals held that the district court properly granted summary judgment in favor of Sharon. 2014 WL 1096602, at *14. We granted the Born Trust's timely filed petition for review pursuant to K.S.A. 20-3018(b), obtaining jurisdiction under K.S.A. 60-2101(b).

In its petition for review, the Born Trust divides its challenge to the Court of Appeals' decision into a number of issues, some of which overlap and some of which are alternative arguments. We take the liberty of consolidating and rearranging the issues for our discussion.

STANDARDS OF REVIEW

The district court decided this case on defendant's summary judgment motion, which is only appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The district court must resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. On appeal, the same rules apply; summary judgment must be denied if reasonable minds could differ as to the conclusions to be drawn from the evidence. *Stanley Bank v. Parish*, 298 Kan. 755, 759, 317 P.3d 750 (2014).

En route to its ultimate decision, the Court of Appeals interpreted the parties' agreements, and the panel interpreted and applied statutory provisions. The interpretation

16

of statutes and written contracts is a question of law over which this court exercises unlimited review, unaffected by the lower courts' interpretations or rulings. See *Prairie Land Elec. Co-op v. Kansas Elec. Power Co-op*, 299 Kan. 360, 366, 323 P.3d 1270 (2014) (appellate court exercises unlimited review over interpretation and legal effect of written instruments; not bound by lower court's interpretation); *Cady v. Schroll*, 298 Kan. 731, 734, 317 P.3d 90 (2014) (statutory interpretation legal question subject to unlimited review).

## VALIDITY OF THE CREDITOR'S STRICT FORECLOSURE

The Born Trust's first three issues on review posed the following questions: (1) Whether Sharon's acceptance of the collateral in satisfaction of the notes under K.S.A. 2013 Supp. 84-9-620 was proper, given that the Born Trust did not consent to that procedure but rather objected thereto; (2) whether the Born Trust was required to both object to the acceptance of collateral and redeem the collateral in order to prevent Sharon from accepting the collateral in satisfaction of the notes under K.S.A. 2013 Supp. 84-9-620; and (3) whether Sharon's sole remedy under the notes and security agreements was to accept the collateral in full satisfaction of the indebtedness.

Those issues were intertwined by the Court of Appeals when it determined that Kansas' version of the Uniform Commercial Code, K.S.A. 84-9-101 *et seq*., applied to the transactions involved in this case; that Sharon's sole default remedy under the written agreements was to accept the collateral in full satisfaction of the remaining indebtedness; and that, in such a case, K.S.A. 2013 Supp. 84-9-620 had to be interpreted to require the Born Trust to both object to the acceptance of collateral and to redeem the collateral by tendering "fulfillment of all obligations secured by the collateral." *Born*, 2014 WL 1096602, at *14. Accordingly, we will consider those three questions together.

17

The Court of Appeals' holding that the UCC applies to the parties' transactions in this case has not been challenged on review, and that holding is supported by K.S.A. 2013 Supp. 84-9-109(a)(1), which states that Article 9 applies to "[a] transaction, regardless of its form, that creates a security interest in personal property or fixtures by contract." Here, the sale transactions created security interests in personal property (corporate stock and LLC membership units) by the two contracts which were labeled "Pledge Agreement." See K.S.A. 2013 Supp. 84-1-201(b)(35) (defining "security interest"). In addition, the parties specifically provided in the security agreements that "all words in this Agreement shall have the meaning given to them in the Uniform Commercial Code."

The applicability of the UCC is important here because, as the panel acknowledged, Article 9 provides a secured party with several remedy options. *Born*, 2014 WL 1096602, at *6-7. Those UCC remedies are cumulative and may be used simultaneously. K.S.A. 2013 Supp. 84-9-601(c), Comment 5. Moreover, K.S.A. 2013 Supp. 84-9-601(a) indicates that the statutory remedies on default are in addition to "those [remedies] provided by agreement of the parties," so long as the agreement does not contravene the nonwaiver provisions of K.S.A. 2013 Supp. 84-9-602. Nevertheless, the Court of Appeals determined that only one remedy could apply in this case, declaring:

> "In the present case, the terms of the parties' agreements specifically limited Sharon to a single remedy—accepting the collateral in full satisfaction of the debt. The UCC regulates the manner in which a secured party may accept collateral. See K.S.A. 2013 Supp. 84-9-620(A). This procedure cannot be waived. K.S.A. 2013 Supp. 84-9-602(10)." 2014 WL 1096602, at 7.

The sole remedy identified by the panel—acceptance of collateral in full or partial satisfaction of the obligation—is set forth in K.S.A. 2013 Supp. 84-9-620. As it relates to the facts of this case, that statute provides that a secured party may accept collateral in

18

full or partial satisfaction of the obligation it secures "*only if*" the debtor consents to the acceptance or the secured party does not receive an authenticated objection to the proposal within 20 days of giving the debtor notice of the proposal. K.S.A. 2013 Supp. 84-9-620(a)(1), (a)(2)(A), and (d).

The remedy described in K.S.A. 2013 Supp. 84-9-620 is also known as a strict foreclosure, which is defined as "a procedure by which the secured party acquires the debtor's interest in the collateral without the need for a sale or other disposition under Section 9-610." K.S.A. 2013 Supp. 84-9-620, Comment 2. "Strict foreclosure eliminates the need for the secured party to dispose of the collateral," and "[w]here the collateral is accepted in full satisfaction of the debt, the secured party effectively waives its right to a deficiency and the debtor waives its right to any surplus." 11 Anderson on the Uniform Commercial Code § 9-620:3 (3d ed. 2007).

"The acceptance or retention of collateral is a permissive, not mandatory remedy. Moreover, a debtor cannot force a secured creditor to accept the property in satisfaction of the debt." 68A Am. Jur. 2d, Secured Transactions § 577. On the other hand, "[b]ecause the debtor loses any right that he [or she] may otherwise have to the amount by which the value of the collateral exceeds the debt ('the surplus'), the debtor *must* consent to the secured party's decision to strictly foreclose upon the collateral." (Emphasis added.) 11 Anderson on the Uniform Commercial Code § 9-620:8. Arguably, that consent must occur at the time the secured party proposes strict foreclosure, rather than at the time the contract is executed. See, *e.g.*, *In re CBGB Holdings, LLC*, 439 B.R. 551, 555 (Bankr. S.D.N.Y. 2010) ("[A] debtor cannot consent to strict foreclosure in anticipation of a future default at the time it enters into the transaction that creates the debt and security interest."). Because both the note balance and the value of collateral can change dramatically over the term of a note, *i.e.*, the existence of surplus or deficit collateral

19

value is a constantly moving target, a "knowing" consent to strict foreclosure can only be made at the time the secured party proposes the strict foreclosure.

The changing effect of strict foreclosure on a debtor's surplus is poignantly illustrated by the TJ Leasing transaction. The promissory note was initially made for the full purchase price of $825,877, plus interest, payable at $50,000 per year. At that rate of repayment, it would take 16.5 years to pay just the principal. But within the first year of the installment note, the debtor paid off nearly half of the indebtedness, only to have the secured party strictly foreclose on the collateral securing the debt, taking any surplus of the collateral's value over the remaining debt that the payment of 45% of the purchase price had generated. To be colloquial, Sharon got to have her cake and eat 45% of it too on the TJ Leasing transaction, at the expense of John's heirs.

Accordingly, the panel's determination that the Born Trust did not consent to the strict foreclosure, but rather timely notified Sharon that it objected to the strict foreclosure proposal should have ended the inquiry with a ruling in favor of the Born Trust. The statute's use of "only if" clearly establishes mandatory conditions precedent to a creditor's permissive use of strict foreclosure. Under our facts, those conditions precedent to strict foreclosure would be either that the debtor consented or that the debtor failed to object after notice. Sharon could not establish either condition; the Born Trust did not consent and it did object.

But the Court of Appeals read into the statute an additional condition that a debtor must establish in order to prevent a secured party from forcing a strict foreclosure. Under the panel's interpretation, a debtor's objection to the strict foreclosure proposal under K.S.A. 2013 Supp. 84-9-620 must be accompanied with a redemption of the collateral under K.S.A. 2013 Supp. 84-9-623. But that does not comport with a plain language construction, under any reasonable interpretation of the common meaning of the common

20

words employed in K.S.A. 2013 Supp. 84-9-620. See *In re Tax Appeal of Burch*, 296 Kan. 713, 722, 294 P.3d 1155 (2013) (when statute plain and unambiguous, appellate court cannot read something into statute that is not there).

Further, the Court of Appeals' interpretation of K.S.A. 2013 Supp. 84-9-620 is inconsistent with other provisions of the UCC. For instance, K.S.A. 2013 Supp. 84-9-623(c)(3) provides that redemption may occur "at any time before a secured party: . . . has accepted collateral in full or partial satisfaction of the obligation it secures under K.S.A. 2013 Supp. 84-9-622, and amendments thereto." The K.S.A. 2013 Supp. 84-9-622 referred to in that redemption provision deals with the effect of an acceptance of collateral, and its corresponding Comment explains: "The acceptance to which it refers is an effective acceptance. If a purported acceptance is ineffective under Section 9-620, *e.g.*, *because the secured party receives a timely objection from a person entitled to notification*, then neither this subsection nor subsection (b) applies." (Emphasis added.) K.S.A. 2013 Supp. 84-9-622, Comment 2. Pointedly, the comment does not say that to avoid the effects of an acceptance the debtor must also redeem the collateral.

The only way to statutorily square the Court of Appeals' result would be to infer that it found that the Born Trust's ineffectual redemption of collateral under K.S.A. 2013 Supp. 84-9-623 acted as a waiver or a variance of the rules by which a debtor prevents strict foreclosure with a notification of objection under K.S.A. 2013 Supp. 84-9-620. But that pathway runs counter to the proscription against waiver or variance in K.S.A. 2013 Supp. 84-9-602. The Court of Appeals opinion mentions that statute in passing but fails to acknowledge that it does not apply to Sharon's rights. To the contrary, the statute begins with the following limiting language, to-wit: "[T]o the extent that they give rights to a debtor or obligor and impose duties on a secured party, the debtor or obligor may not waive or vary the rules stated in the following listed sections." K.S.A. 2013 Supp. 84-9-602. In other words, the nonwaiver statute only proscribed a waiver or variance of a

21

statutory rule by TJ Leasing or the Born Trust (as debtor and obligor, respectively); the statute did not prevent a waiver or variance of a statutory rule by Sharon, as the secured party. Moreover, K.S.A. 2013 Supp. 84-9-602 only prevented a waiver or variance of a statutory rule that gave TJ Leasing or the Born Trust a right or that imposed a duty on Sharon; rules giving rights to Sharon or imposing duties on TJ Leasing or the Born Trust were unaffected by K.S.A. 2013 Supp. 84-9-602.

K.S.A. 2013 Supp. 84-9-620, dealing with the acceptance of collateral in satisfaction of the obligation, *i.e.*, strict foreclosure, is one of the sections listed in K.S.A. 2013 Supp. 84-9-602 as containing debtor's rights and/or secured party's duties that cannot be waived or varied. Yet, the panel did that very thing; it varied the statutory rules of K.S.A. 2013 Supp. 84-9-620 by taking away the right of a debtor/obligor to prevent strict foreclosure by the sole and only act of effectively objecting to the secured party's proposal. Put another way, the panel's additions to K.S.A. 2013 Supp. 84-9-620 not only violated canons of statutory construction but also ran counter to the specific nonvariance provisions of K.S.A. 2013 Supp. 84-9-602.

Apparently, the Court of Appeals felt compelled to augment the statute governing strict foreclosure because it opined that the circumstance into which Sharon had placed herself by written agreements left her with no remedy when the Born Trust exercised its statutory right to object to strict foreclosure. Again, the parties' agreements could waive or vary Sharon's rights without violating K.S.A. 2013 Supp. 84-9-602. Therefore, court intervention to restore any right or remedy that Sharon might have contracted away was not statutorily warranted or appropriate.

Moreover, as will be discussed below, the panel's initial premise—that the parties' agreements only permitted Sharon to strictly foreclose on the collateral upon default— was faulty and doomed its analysis from the outset. Nevertheless, even if the parties'

22

written agreements had created an untenable circumstance for the secured party that the court could or should rectify, the fix should have been aimed at the provisions of the agreements causing the problem, rather than revising the applicable statutory provisions.

There is statutory support for fixing the agreements. For instance, K.S.A. 2013 Supp. 84-9-603(a) indicates that where the parties are permitted to determine by agreement the standards measuring the fulfillment of rights and duties, those standards cannot be "manifestly unreasonable." *Cf.* K.S.A. 84-2-302(1) (court may limit application of unconscionable clause of sales contract to avoid any unconscionable result). Likewise, there is contractual support for fixing any invalid provisions in the agreements. The parties' security agreements contained a severability provision stating that "if any one or more such paragraphs shall be adjudged or declared illegal, invalid or unenforceable, this Agreement shall be interpreted and shall remain in full force and effect as though such paragraph or paragraphs had never been contained in this Agreement." In short, a determination that a provision of the parties' agreements is manifestly unreasonable or unconscionable does not provide the justification for a court to revamp a statute that had nothing to do with creating the perceived problem.

Turning to the question of whether the agreements limited Sharon's default option to strict foreclosure, we first observe that the Court of Appeals focused entirely on Sharon's rights under the default paragraph of the security agreements. After substituting Sharon's name for that of her assignor, Born Stone, Inc., the default and remedies paragraph in the TJ Leasing security agreement provided:

> "Whenever an Event of Default exists as set forth in the Note beyond any applicable cure period, or in the event Members fail to comply with the provisions of Paragraph 6, [Sharon] shall accept the Collateral by giving notice of such fact to Members in which case [Sharon] shall forthwith take possession of the Collateral and all interest of Members therein shall be forfeited and shall cease and terminate, and neither

23

[Sharon] nor Members shall have an [*sic*] further liability to the other under this Agreement."

We pause to note that the parties and the panel did not acknowledge that, in connection with the asset purchase transaction, the borrower on the promissory note is TJ Leasing, but the assets pledged to secure that note are individually owned by the Born Trust and Todd. The record does not reflect whether the TJ Leasing members personally guaranteed the full amount of the corporate debt or whether they simply pledged their individual assets to secure the debt only to the extent of the value of those pledged assets. Nevertheless, the failure to differentiate between the debtor and the other obligors on the TJ Leasing note will not affect our resolution of this appeal.

In the stock purchase transaction, where the borrower on the note was also the owner of the assets pledged as security, the security agreement contained essentially the same default provision, to-wit:

> "Whenever an Event of Default exists as set forth in the Note beyond any applicable cure period, or in the event Stockholder fails to comply with provisions of Paragraph 6, [Sharon] shall accept the Collateral by giving notice of such fact to Stockholder in which case [Sharon] shall forthwith take possession of the Collateral and all interest of Stockholder therein shall be forfeited and shall cease and terminate, and neither [Sharon] nor Stockholder shall have an [sic] further liability to the other under this Agreement."

The panel apparently read the phrase, "shall accept the Collateral," as meaning that "the parties' agreements specifically limited Sharon to a single remedy—accepting the collateral in full satisfaction of the debt." But, of course, the phrase does not specifically state that acceptance of collateral is Sharon's exclusive remedy. Moreover, reading the phrase in context would refute that such a reading should be implied. Within the same

24

sentence, the phrase is immediately followed by the words, "by giving notice of such fact to Stockholder," which could indicate that the word "shall" was intended to mandate the manner in which Sharon could accept the collateral. To paraphrase, the sentence could mean: "To use the acceptance of collateral remedy, Sharon shall give notice of such fact to Stockholder." Nevertheless, the security agreement certainly does not mandate that the remedies provided under the UCC, which are in addition to those provided by the agreement, are not applicable to this transaction.

More importantly, however, the paragraph begins by referring to the provisions of the promissory note, specifically mentioning the events constituting a default set forth in the note and any applicable cure period. That reference acknowledges that the promissory note contains certain rights and duties as between the lender and borrower, separate and apart from the security agreement. Indeed, the note and the security agreement perform separate functions. The note governs the manner and method of the repayment of the debt, whereas the security agreement governs the disposition of the collateral pledged to assure the performance of the debtor under the note. See 8A Anderson on the Uniform Commercial Code § 9-102:42 ("The purpose of a security interest is that 'the collateral serves to assure repayment of the debt in case of default.'").

Here, as previously indicated, the note enumerates the events which would place the borrower in default, one of which was "the death of either John H. Born, Jr. or Todd Born." The next paragraph of the note, entitled "Acceleration of Purchase Price Note upon Event of Default," states:

> "Upon the occurrence of an Event of Default, Lender may, at its option and in its sole discretion, declare the entire balance of this Purchase Price Note, including all interest, costs, expenses, charges, disbursements and fees payable by Borrower hereunder, to be immediately due and payable, and upon such declaration all sums outstanding and unpaid under this Purchase Price Note shall become and be in default,

25

matured and immediately due and payable, without presentment, demand, protest or any notice of any kind to Borrower or any other person."

That provision of the notes gave Sharon the *option* to accelerate the notes and demand payment of the remaining balances. There is nothing that would have precluded Sharon from accepting Betty's proffer of the $50,000 annual payments on each note, rather than declaring an acceleration. But in either event, paragraph 1.c. of the note directs the borrower as follows: "All payments due under [the] Purchase Price Note shall be made to Lender [at her address] in lawful money of the United States." The notes contemplated cash payments.

Clearly, then, upon John's death, the promissory notes gave Sharon remedies other than strict foreclosure of the collateral, *e.g.*, she could continue to accept annual payments under the installment notes or she could declare an acceleration of the notes and receive monetary payments of the full amount of their remaining balances. Nothing in the provisions of the notes would suggest that the lender was limited to receiving the "immediately due and payable" accelerated note balances in the form of forfeited collateral. To the contrary, the intended endgame on a promissory note is normally the full payment of the debt, rather than a foreclosure on the securing collateral.

Moreover, the remedies available to a lender under a promissory note are not lost simply by taking a security interest in the debtor's collateral. A secured party, *i.e.*, a person who has loaned money and secured collateral to assure repayment, "may also, at its option, ignore that security and satisfy its judgment from other property in the hands of the judgment debtor." *Kennedy v. Bank of Ephraim*, 594 P.2d 881, 884 (Utah 1979). See also *Gillenwater v. Mid-American Bank & Tr. Co.*, 19 Kan. App. 2d 420, Syl. ¶ 3, 870 P.2d 700 (1994) (holding that creditor was not required to foreclose on a mortgage securing a note, but instead creditor could first sue debtors on the note). In other words,

Sharon always had the option to forego a pursuit of her interest in the collateral under the security agreements and simply assert her right to repayment under the notes.

In this case, Sharon attempted to take both routes; she declared the accelerated notes "immediately due and payable," while at the same time proposing to accept the collateral in full satisfaction of the debts. When the Born Trust, as obligor on the TJ Leasing note and debtor on the Stock Purchase note, objected to Sharon's strict foreclosure proposal, that remedy was precluded by statute. But Sharon's right to accept payment of the amounts due under the notes was still very much alive and well.

Likewise, both notes gave the borrower the right to prepay any amount of indebtedness at any time; nothing in either note purports to extinguish the borrower's right to pay the notes with money when the lender declares an acceleration. That result should not change simply by labeling the tender of payment due on the note as a cure for a default. To the contrary, even the security agreements contemplate the possibility that an Event of Default can be cured, *e.g.*, by payment in full, before the collateral remedies are invoked. The default/remedies paragraph in both security agreements specifically states that its provisions apply "[w]henever an Event of Default exists . . . beyond any applicable cure period." Certainly, that language is inconsistent with Sharon's argument that the parties intended strict foreclosure to be automatically and immediately triggered when John died, without any opportunity to cure the default with full payment.

In summary, when Sharon invoked her Event of Default option to accelerate the notes, declaring the remaining balances to be immediately due and payable, the Born Trust, as obligor under one note and debtor under the other, had the right to cure the declared default by paying the accelerated balances on the notes "in lawful money of the United States." Sharon was not prohibited by law or by agreement from accepting the tender of a monetary payment on the accelerated debt. She was, however, prohibited by

27

law from strictly foreclosing on the collateral without the consent and over the objection of the Born Trust.

The Born Trust made a concerted effort to exercise its right to pay the accelerated notes in full. First, the day following Sharon's notice of acceleration, the trust's attorney contacted Sharon's attorney to proffer and arrange for payment in full on the remaining balances. On Sharon's behalf, her attorney rejected the proffer, taking the position that she did not have to accept note payments because she was strictly foreclosing on the collateral. Notwithstanding Sharon's blanket refusal to accept any monetary payments, the Born Trust followed its proffer by tendering a $964,144.87 certified check to Sharon's counsel, indicating that it was intended to "satisfy all amounts due under the contracts." Sharon's attorney rejected the payment and returned the certified check, again asserting that strict foreclosure was the only remedy.

The Court of Appeals found that the tender of payment was an ineffectual redemption of collateral because it was for an amount less than the total remaining balance on the two notes. It supported that conclusion by stating that the parties later agreed that the balances on the notes totaled $1,193,036.74. 2014 WL 1096602, at *4. But the panel does not indicate whether that figure takes into account the value of surrendered collateral. Certainly, TJ Leasing, as the borrower on the asset purchase note, was entitled to a credit against the TJ Leasing note for the value of the collateral its member transferred to the lender, in the same manner as it received credit for the gratuitous $375,000 prepayment on the note to help Sharon out of her tax problem.

But the district court did not make any factual findings on the value of Todd's membership units that were surrendered to Sharon, except to observe that the value of a minority stock holding is sometimes discounted. That observation is suspect for more than one reason. First, if the outstanding balance of the TJ Leasing note is disputed

28

because the amount of credit for surrendered collateral is in dispute, summary judgment would not have been proper.

Next, even if the value of Todd's membership units was discounted, it was worth something, and that something should have been credited against the debt. The panel's holding that a partial acceptance of collateral was not permitted is belied by Sharon's actions in accepting the partial strict foreclosure in lieu of payment. If the Born Trust has to pay the entire balance on the TJ Leasing note, without reduction for Todd's surrendered collateral, does the trust seek contribution from Todd or Sharon?

Finally, if the minority discount to which the district court referred is from the current book value of the TJ Leasing membership units, the discounted value of 49% of the units might well exceed the value of 49% of the remaining balance on the TJ Leasing note (which the Born Trust claimed). That result could easily obtain if the company's profits in its first year of operation increased the book value of its units or if the book value remained the same but the note balance was drastically reduced by the large prepayment, or both.

But more importantly, Sharon did not reject the Born Trust's tender of payment because she disputed the amount tendered. She wrongfully rejected the tender in order to force a strict foreclosure, which was not permitted by law or required by agreement. Accordingly, the Born Trust's good faith tender of the amount it believed to be due on the notes, in the absence of any claim at the time by Sharon that the tender was insufficient, established the Born Trust's right to cure the Event of Default by paying the notes and triggered the date on which to establish the indebtedness. *Cf.* K.S.A. 84-3-603(c) ("If tender of payment of an amount due on an instrument is made to a person entitled to enforce the instrument, the obligation of the obligor to pay interest after the due date on the amount tendered is discharged."). Sharon's later claim that the amount tendered was

29

not enough simply served to establish the existence of a material disputed fact that the district court should have resolved.

Consequently, the holdings of the Court of Appeals are reversed. The matter is remanded to the district court for further proceedings to determine, as of September 28, 2011, the amount due from the Born Trust on the stock purchase note and the amount due from TJ Leasing on the asset purchase note, giving appropriate credit for the value of Todd's transferred membership units to the lender. Upon payment of those amounts, Sharon's liens against the pledged collateral shall be terminated and released.

Reversed and remanded.