NOT DESIGNATED FOR PUBLICATION

No. 126,204

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

GENESIS HEALTH CLUBS MANAGEMENT, LLC,
*Appellant*,

v.

BEAUTYDOT MANAGEMENT, LLC, et al.,
*Appellees*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; ERIC A. COMMER, judge. Oral argument held November 14, 2023. Opinion filed February 23, 2024. Reversed and remanded.

*Jason L. Bush* and *Brendan McPherson*, of Polsinelli PC, of Kansas City, Missouri, and *Britton L. St. Onge*, pro hac vice, of Polsinelli PC, of St. Louis, Missouri, for appellant.

*Rylee M. Broyles*, *Christopher M. McHugh*, and *Carrie E. Parker*, of Joseph, Hollander & Craft LLC, of Wichita, for appellee BeautyDot Management, LLC.

Before BRUNS, P.J., COBLE and PICKERING, JJ.

PER CURIAM: This appeal arises from a dispute over the terms of a commercial real estate lease. The landlord, Genesis Health Clubs Management, LLC (Genesis), leased real property to BeautyDot Management, LLC, and BeautyDot Medical, LLC (collectively BeautyDot). After BeautyDot defaulted on the lease agreement, Genesis filed this action seeking to evict BeautyDot and a subtenant. In addition, Genesis sought to collect past due rent from BeautyDot and from Dr. David Hellman, who was a guarantor under the lease.

1

Following discovery, both Genesis and BeautyDot filed motions for summary judgment. The district court granted BeautyDot's summary motion and denied—in large part—Genesis' motion for summary judgment. For the reasons set forth in this opinion, we find that the district court erred in granting summary judgment to BeautyDot. Thus, we reverse the district court's decision and remand this matter for further proceedings.

FACTS

On August 30, 2016, Genesis leased commercial property located at 1551 N. Rock Road in Wichita to BeautyDot. According to the "Lease" signed by the parties, the property was to be used by BeautyDot for "[a]esthetic and day spa services, including surgical and non-surgical aesthetic procedures and treatments, massage and other spa type services, retail sales, and sublease." The term of the Lease was to be three years with options for extension upon 90 days' notice.

Section 1 of the Lease—which is entitled "Basic Lease Provisions"—sets out "definitions and other terms and conditions that are referred to in other sections of [the] Lease." Moreover, Section 1 provides that other provisions of the Lease are to "be construed to incorporate all of the terms provided under the terms defined in the Basic Lease Provision[s]." However, if there is a "conflict between a provision in the Basic Lease Provisions . . . and a provision in another section of . . . [the] Lease . . . the latter will control."

In Subsection 1.13 of the Basic Lease Provisions, the "Minimum Rent" to be paid by the tenant was set at $5,000 a month—or an "Annual Minimum Rent" of $60,000—with an increase after 48 months. For the first 48 months the Annual Minimum Rent was to be $60,000. But for the first month of the Lease, Subsection 1.14 only required the tenant to pay the Minimum Rent of $5,000. In addition, Subsection 1.15 of the Basic Lease Provisions provided that the tenant was to pay "Percentage Rent" of 5% of its

2

"Monthly Gross Services above $20,000." BeautyDot was also required in the Basic Lease Provisions to pay a "Security Deposit" in the amount of $5,000.

Section 4 of the Lease—which is entitled "Rent"—addresses several matters relating to the payment of rent as well as to the payment of the security deposit. In Subsection 4.1, the Lease provides: "As used herein, 'Rent' means collectively Minimum Rent, as such terms are defined herein." This subsection also provides that BeautyDot "shall pay Rent without notice, demand, or abatement."

It is undisputed that BeautyDot's rent obligations under the Lease began on March 1, 2017. Because BeautyDot's renovation of the premises took longer than expected, Genesis agreed to accept 50 percent of the rent due for March 2017, April 2017, and May 2017 and to defer the payment of the other 50 percent for one year. Finally, in March 2018, BeautyDot began operating its business in the leased premises.

Beginning in May 2018, Genesis began requesting that BeautyDot provide gross monthly revenue figures for the services rendered by the business in order to calculate the amount of Percentage Rent due under the terms of the Lease. Likewise, Genesis provided BeautyDot with a spreadsheet that could be used to report gross revenues. In response, BeautyDot did not object to Genesis' request but instead its representative stated that the business had "not exceeded the 20k yet. But when they do, which I'm sure they will, I'll make sure and add it to your spreadsheet."

On June 7, 2018, BeautyDot asked Genesis to reduce the rent for June 2018 through August 2018 to allow it to hire someone to help produce additional revenue. Genesis agreed to reduce the rent to $1,500 for those months, with the past rent to be made up by BeautyDot in January 2019, February 2019, and March 2019. Again, Genesis asked BeautyDot to provide monthly reports of its gross revenue so that it could calculate the Percentage Rent due. In response, a representative of BeautyDot stated, "Yes as soon

as spa rev exceeds 20k I'll be able to send reports. With this new employee and adding an extra spa room I assume it won't be long."

In reply, Genesis informed BeautyDot that it should provide monthly reports for all of its gross revenue for services rendered by the business in excess of $20,000. Genesis also requested information regarding the gross revenue for all of the services rendered by BeautyDot at the leased premises and not simply that received from non-medical spa services. Over the following months, Genesis continued to request gross monthly revenue information from BeautyDot. Although BeautyDot indicated on several occasions that it would provide this information to Genesis, it never did so.

Consequently, on December 31, 2019, Genesis sent BeautyDot a formal "Notice of Default and Demand for Performance" in which it sought financial information for the previous 24 months in order to calculate the Percentage Rent due under the Lease. Genesis also advised that once it received this financial information, it would notify BeautyDot of the amount of the outstanding Percentage Rent to be paid within 10 days of such notice. On January 8, 2020, BeautyDot responded, "we have not hit the 20k in spa sales," but that "[w]e do track numbers and [our] bookkeeper is well aware of the 5%."

After not making any progress on its request for financial information in order to calculate the Percentage Rent, Genesis served BeautyDot with a three-day Notice to Quit on February 13, 2020. In response, BeautyDot represented to Genesis that it had "always been upfront . . . about the 5% owed. It has been part of our processes from day 1. We have a spreadsheet we use each month and although we've gotten close we have never exceeded the 20k in spa [revenue]." On February 27, 2020, BeautyDot provided Genesis a report which included gross revenue generated from nonmedical spa services but failed to provide information on all of the revenue generated.

4

Genesis filed this lawsuit against BeautyDot, its subtenant, and the guarantor on March 11, 2020. Based on Genesis calculations, BeautyDot had exceeded the $20,000 gross revenue threshold for the payment of Percentage Rent in addition to the Minimum Rent nearly every month. As a result, Genesis claimed that BeautyDot owed it Percentage Rent in excess of $135,000.

In its responsive pleadings, BeautyDot never denied—and in fact repeatedly acknowledged—that it was obligated to pay Percentage Rent under the Lease. But BeautyDot claimed that its gross revenue had never reached a level to trigger the Percentage Rent threshold of $20,000. In fact, all of the codefendants admitted in pleadings filed with the district court that there was an obligation to pay Percentage Rent under the terms of the Lease if the threshold was met.

Following discovery, both Genesis and BeautyDot filed motions for summary judgment. In doing so, BeautyDot argued for the first time that the Lease did not require it to pay any amount in Percentage Rent. On May 26, 2022, the district court held a hearing on the summary judgment motions. After hearing the arguments of counsel, the district court ruled from the bench.

In granting BeautyDot's motion for summary judgment, the district court determined that the tenants were not required to pay Percentage Rent under the terms of the Lease. Among other reasons given for reaching this conclusion, the district court found the provisions of Subsection 1.15 to be in conflict with Subsection 4.1 of the Lease. As a result, the district court concluded that Subsection 4.1 "controls" over Subsection 1.15 of the Lease and, as a result, it disregarded the language relating to Percentage Rent in Section 1 of the Lease.

On July 1, 2022, the district court issued a written order in which it journalized its bench ruling. In its order, the district court found that "[t]he Lease is not ambiguous as

5

written" and concluded that "'Percentage Rent' is not owed by the Tenants," while reserving the issue of attorney fees for a future hearing. Although the district court did not explain the rationale for its decision in the written order, it did incorporate its bench ruling by reference. After the district court denied a motion to alter or amend judgment filed by Genesis, Genesis filed a timely notice of appeal.

ANALYSIS

*Issue Presented*

On appeal, Genesis contends that "[t]he Lease speaks clearly and unambiguously by requiring the tenant to pay the 'Percentage Rent' listed in [Subsection] 1.15 as a component of the total rent owed." In support of its position, Genesis points out that BeautyDot "freely acknowledged" this obligation in its pleadings filed in the district court. In response, BeautyDot agrees that the language of the Lease is unambiguous, but it interprets it much differently than Genesis. Instead, it argues that "the language of the Lease required BeautyDot to pay Minimum Rent, but not Percentage Rent."

The issue presented on appeal is whether the district court erred in granting summary judgment to BeautyDot as a matter of law. We pause to note that Genesis has also presented an alternative argument if we were to find the Lease to be ambiguous. In that event, Genesis argues that the presentation of extrinsic or parol evidence would be appropriate to determine the intent of the parties. However, because we do not find the Lease to be ambiguous, we will not address this alternative issue.

*Standard of Review*

Here, the resolution of the issue presented requires interpretation of the Lease agreement executed by the parties. Because our decision hinges on the interpretation and effect of a written agreement, it involves a question of law and our review is unlimited.

6

As a result, our review is unaffected by the district court's interpretation of the lease agreement. *Born v. Born*, 304 Kan. 542, 554, 374 P.3d 624 (2016).

Our goal in interpreting a written agreement is to determine the intent of the parties. *Liggatt v. Employers Mutual Cas. Co.*, 273 Kan. 915, 921, 46 P.3d 1120 (2002). In interpreting a written agreement, we are to determine "the parties' intent from the four corners of the agreement, construing '"all provisions together and in harmony with each other rather than by critical analysis of a single or isolated provision."'" *Iron Mound v. Nueterra Healthcare Management*, 298 Kan. 412, 418, 313 P.3d 808 (2013). In other words, we are to construe and consider the language used by the parties based on a reading of the language used in the whole agreement. *Thoroughbred Associates v. Kansas City Royalty Co.*, 297 Kan. 1193, 1206, 308 P.3d 1238 (2013).

The law also favors a reasonable interpretation of written agreements, and we are to avoid an interpretation that invalidates the purpose of the agreement. *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 963, 298 P.3d 250 (2013). Additionally, we are not to find a disputed term or provision in a written agreement to be ambiguous unless the intent of the parties cannot be determined under a reasonable interpretation of the language used by the parties. *Geer v. Eby*, 309 Kan. 182, 192, 432 P.3d 1001 (2019).

When interpreting the language used in a written agreement, we are to give the words used by the parties their common or customary meaning. *Pfeifer v. Federal Express Corp.*, 297 Kan. 547, 550, 304 P.3d 1226 (2013), Furthermore,

> "'[w]ords are never to be rejected as meaningless or repugnant if by any reasonable construction they may be made consistent and significant. Excision is a "desperate remedy."'" *In re Estate of Cline*, 170 Kan. 496, 502, 227 P.2d 157 (1951) (quoting *Regnier v. Regnier*, 122 Kan. 59, 61, 251 P. 392 [1926]).

Accordingly, although we are not to add terms into a written agreement that were not used by the parties, we must also be careful not to interpret a written agreement "in a manner which renders a term of the contract meaningless." *Guss v. Fort Hays State University*, 38 Kan. App. 2d 912, Syl. ¶ 8, 173 P.3d 1159 (2008).

*Interpretation of Lease Agreement*

In the first section of the Lease—which is entitled "Basic Lease Provisions"—the parties made clear that their mutual intent was for BeautyDot to rent commercial property from Genesis for the purpose of conducting a business. Subsection 1.5 of the Lease provides that BeautyDot would operate the business under the tradename "BeautyDot Medical & Day Spa." Further, Subsection 1.7 describes the nature of the business to be conducted at the leased premises as "[a]esthetic and day spa services, including surgical and non-surgical aesthetic procedures and treatments, massage and other spa type services, retail sales, and sublease."

The prelude to Section 1 indicates that this portion of the lease not only sets out "certain definitions" but also "other terms and conditions that are referred to in other sections of [the] Lease." In addition, the prelude to Section 1 provides that the other sections of the Lease are to "be construed to incorporate all of the terms provided under the reference provisions in the Basic Lease Provision[s]." Nevertheless, in the event that there is an otherwise unreconcilable conflict in which the Basic Lease Provision and another provision of the Lease cannot be reasonably construed together, "the latter will control."

Further, Section 1 identifies many of the fundamental obligations of the parties under the Lease. Specifically, Section 1 of the Lease identifies the parties, the premises to be leased, and—as indicated above—the type of business to be conducted on the premises. It also provides term of the Lease—three years with options to renew upon the

8

giving of appropriate notice—and sets forth the formula for the payment of rent, the amount of the initial month's rent, the security deposit to be paid by the tenant, and the name of the Guarantor.

Regarding the payment of rent, Subsection 1.10 states that it was to commence 180 days following the delivery of the premises by Genesis to BeautyDot. As discussed above, Subsection 1.13 required BeautyDot to pay Minimum Rent in the amount of $5,000 a month—or Annual Minimum Rent in the amount of $60,000—for the first 48 months with periodic rent increases based on the length of occupancy. Additionally, Subsection 1.15 of the Lease provided for Percentage Rent in the amount of "5% Monthly Gross Services above $20,000."

Section 4 of the Lease contains additional details about the rent to be paid, the acceptance of rent, and the security deposit. In particular, Subsection 4.1 states:

> "Tenant's Agreement to Pay Rent. As used herein, 'Rent' means collectively Minimum Rent, as such terms are defined herein. Tenant shall pay Rent without notice, demand, or abatement."

Construing the provisions of the Lease together and in harmony with each other, we do not find that Subsection 4.1 conflicts with Subsection 1.15. Rather, we find that the plain language of Subsection 4.1 recognizes the necessity to look to other provisions of the Lease—by using the words, "[a]s used herein" and "as such terms are defined herein." Significantly, the terms Minimum Rent, Annual Minimum Rent, and Percentage Rent are explained in Section 1 of the Lease.

As discussed above, we are to give the words used in a written agreement their common or customary meaning. *Pfeifer*, 297 Kan. at 550. Here, we find the common definition of the word "minimum" as used in both Section 1.13 and Subsection 4.1 of the Lease to mean "the least quantity assignable, admissible, or possible." Merriam-Webster

9

Dictionary, https://www.merriam-webster.com/dictionary/minimum. It is synonymous with "lowest" or "smallest." Merriam-Webster Thesaurus, https://www.merriam-webster.com/thesaurus/minimum. As a result, we find the terms Minimum Rent or Annual Minimum Rent to mean the least amount of rent that would be owed by BeautyDot for a given period of time.

Similarly, we find that the term "collectively" as used in Subsection 4.1 of the Lease commonly means "denoting a number of . . . things considered as one group or whole." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/collectively. It is synonymous with "together," in "the aggregate," or "totally." Merriam-Webster Thesaurus, https://www.merriam-webster.com/thesaurus/collectively. Hence, we find that the reference to collectively also points to the fact that there is a possibility that the tenant may have to pay a total amount of rent greater than the Minimum Rent or Annual Minimum Rent based on the terms found elsewhere in the Lease.

When Section 1 and Section 4 of the Lease are read together, we do not find them to be ambiguous. Rather, we conclude from the four corners of the Lease that it was the mutual intent of the parties that BeautyDot pay Minimum Rent in the amount of $5,000 a month—or Annual Minimum Rent in the amount of $60,000—for the first 48 months. In addition, BeautyDot was to pay Percentage Rent based on the formula set out in Subsection 1.15 of the Lease. In other words, a reasonable interpretation of the written agreement when read as a whole is that the tenant was to pay 5% of its monthly gross income for services rendered by BeautyDot whenever they were in excess of $20,000. Any other interpretation would render the terms Minimum Rent, Annual Minimum Rent, and Percentage Rent to be meaningless.

We also find this interpretation of the Lease to be consistent with the position taken by BeautyDot prior to the filing of this lawsuit and with the position it took—at

least initially—in the district court. As noted above, BeautyDot acknowledged in its pleadings—including its original answer, amended answer, answer to the first amended petition, and amended counterclaim—that it owed Percentage Rent in addition to the Minimum Rent if the conditions set forth in the Lease were met. Instead, it disputed the amount of Percentage Rent that was due and owing under the formula set out in the Lease. Regardless of whether these types of statements set forth in BeautyDot's pleadings are sufficient to rise to the level of binding admissions, they are at the very least consistent with our interpretation of the Lease.

Ultimately, whether a party breached one or more provisions of a written agreement is a question of fact. *Peterson v. Ferrell*, 302 Kan. 99, 104, 349 P.3d 1269 (2015). Consequently, we take no position regarding what amount of Percentage Rent—if any—is due and owing by BeautyDot to Genesis under the formula set forth in the Lease. Instead, we find that to be a question best left to the finder of fact whether it be the district court or a jury. Finally, in light of our opinion, we deny BeautyDot's motion for appellate attorney fees and costs.

Reversed and remanded.