NOT DESIGNATED FOR PUBLICATION

No. 123,048

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CRK DEVELOPMENT, LLC, and THE DWELLINGS HOMEOWNERS' ASSOCIATION,
*Appellants*,

v.

BUCKHEAD LAKESIDE HOMEOWNERS ASSOCIATION, INC.,
*Appellee*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; ERIC A. COMMER, judge. Opinion filed July 2, 2021.
Affirmed.

*David M. Hahn* and *Mark G. Ayesh*, of Ayesh Law Offices, of Wichita, for appellant.

*Jordan E. Kieffer*, of Dugan & Giroux Law, Inc., of Wichita, for appellee.

Before ARNOLD-BURGER, C.J., HILL, J., and MCANANY, S.J.

PER CURIAM: When interpreting a written contract, the primary rule is to determine the parties' intent. "'If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction.'" *Peterson v. Ferrell*, 302 Kan. 99, 104, 349 P.3d 1269 (2015). We also interpret contracts by construing and considering the entire instrument from its four corners—not by isolating one sentence or provision. *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 963, 298 P.3d 250 (2013).

This case involves a dispute over the language of a contract between CRK Development, LLC (CRK) and Buckhead Lakeside Homeowners Association, Inc.

1

(Buckhead) for an easement on the east bank of Buckhead Lake for storm water drainage. The easement was for the benefit of CRK's upscale residential housing development known as The Dwellings. Over time, Buckhead began allowing the natural foliage to grow on the east bank for erosion control. CRK and the Dwellings Homeowners' Association Inc. filed a lawsuit arguing Buckhead breached the contract. They contended that the term "maintenance" in the contract included an aesthetic component, thus requiring Buckhead to maintain the appearance of the east bank along with its purpose and function as a storm water drainage easement.

Because we agree with the district court that the contract unambiguously only required maintenance of the east bank for its functional purpose as a storm water drainage easement, we find Buckhead was properly granted summary judgment.

FACTUAL AND PROCEDURAL HISTORY

In early 2004, CRK began developing an upscale residential housing development in Wichita known as The Dwellings, which has a homeowners' association called the Dwellings Homeowners' Association (Dwellings). During development, CRK learned that it needed a retention system for storm water drainage runoff from The Dwellings but building one would be costly. In October 2004, CRK began negotiating with Buckhead for the development to become part of Buckhead and have access to Buckhead Lake. After extensive negotiations, the parties entered a contract in July 2005 that Buckhead would grant CRK an easement to use the east bank of Buckhead Lake for drainage of storm water into the lake.

Almost 14 years later, CRK and Dwellings petitioned for declaratory judgment arguing that Buckhead breached the contract by allowing the east bank to become overgrown with vegetation and asking the district court to order Buckhead to maintain the easement as intended in the contract. Buckhead filed an answer and a counterclaim

2

for declaratory judgment, asking the court to enter an order that the contract only required functional maintenance to allow the storm water drainage from The Dwellings to continue to flow into Buckhead Lake.

Buckhead moved for summary judgment, asking the district court to find that the contract did not require aesthetic maintenance. As support, Buckhead included a statement of seven uncontroverted facts, essentially asserting that the purpose of the contract was only to create a storm water drainage easement and that CRK and Dwellings could not identify any instance in which its storm water failed to drain properly.

CRK and Dwellings responded, claiming that the "extensive negotiations" between the parties before signing the contract showed that maintenance contained both a functional component and an aesthetic component. Although CRK and Dwellings did not dispute most of the uncontroverted facts in Buckhead's summary judgment motion, they disagreed that the statement of the contract's purpose was what the parties intended. CRK and Dwellings provided their own statement of 18 uncontroverted facts, mostly detailing the negotiations before the signing of the contract. According to CRK and Dwellings, both parties understood maintenance to have a functional *and* aesthetic component because the president of Buckhead acknowledged that CRK had used photographs of the lakeside views in advertisements to potential homeowners.

Buckhead responded, agreeing with most of the uncontroverted facts set out in CRK and Dwellings' response. Still, Buckhead generally disputed whether the prior negotiations showed that the parties intended for the contract to incorporate maintaining lakeside views as a requirement. Buckhead also asserted additional uncontroverted facts further detailing the negotiations between the parties, including that the initial proposals discussed the lakeside views in the context of Dwellings potentially joining Buckhead, but those negotiations ultimately fell through. Thus, Buckhead reiterated its argument

3

that the contract only dealt with the storm water drainage easement and lacked any mention of lakeside views or aesthetic components.

In June 2020, the court announced it was granting Buckhead's summary judgment motion. In the journal entry, the court found these uncontroverted facts supported its decision:

"8.     The Agreement's purpose was stated, in part, as follows:  'The purpose of this Agreement is to create a storm water drainage easement on the east side of Buckhead Lake (Reserve A) providing access for storm water draining from the Koker Addition. BUCKHEAD LAKESIDE, on behalf of itself, successors, and assigns hereby grants to CRK, its successors and assigns, a perpetual storm water draining easement on the east side of Buckhead Lake Reserve A subject to the terms and conditions hereinafter set forth.' *See* The Agreement, ¶ 3.

"9.     In exchange for this perpetual easement, CRK paid an up-front fee of $12,000.00, and agreed to an additional annual lake payment of $2,000.00 for annual lake maintenance, detailed as follows:

"Upon the execution date of this Easement Agreement CRK shall pay to BUCKHEAD LAKESIDE Twelve Thousand Dollars ($12,000). Commencing on January 1 following completion of the construction of the drainage easement the homeowners for Koker Addition (an entity to be formed by CRK) will make annual lake payments of Two Thousand Dollars ($2,000) to BUCKHEAD LAKESIDE for its proportionate share of lake maintenance. The annual lake maintenance fees shall increase by five percent (5%) on January 1, 2011, with similar five percent (5%) increases every five (5) years thereafter.

*See* The Agreement, ¶ 3.

"10.     In Paragraphs 5 and 6 of the Agreement, CRK agreed to be responsible for the construction of the drainage easement, as well as any restoration expenses

4

associated with the completion of landscaping necessary to effect the easement during the construction phase, and to also provide repair work on the east bank to control erosion, 'including the addition of top soil, railroad ties and vegetation to change the pattern of the current drainage into Buckhead Lake. CRK will be responsible for all costs associated with the repair work.' [The Agreement,] ¶ 5.

"11.     Plaintiffs cannot identify any instance in which its storm water failed to drain properly into Buckhead Lake. The Agreement is clear that the annual lake payments were simply intended to compensate Lakeside for the additional burden incurred to its lake (the 'Lake') as a result of the Dwellings' drainage."

Proceeding to its analysis, the district court found that the sole issue appeared to be one of contract interpretation, specifically the meaning of the word "'maintenance'" and whether it was ambiguous. The court relied on dictionary definitions of the word maintenance "which indicate that 'to maintain' means 'the act of keeping property or equipment in good condition by making repairs correcting problems' as well as 'to keep in appropriate condition, operation, or force; keep unimpaired.'" Yet, "[i]n contrast, the word 'aesthetic' means 'of or relating to beauty.'"

After reviewing the relevant caselaw, the district court determined:

"[T]he express purpose of the Agreement is to create a storm water drainage easement for Plaintiffs via the Lake owned by Defendant. The Court finds no basis in the contract that aesthetics was intended as part of the purpose; rather, only that the lake be maintained in such a way that way water will flow. The Court finds that the term 'maintenance' in the Agreement is unambiguous; therefore, no parol evidence shall be entered or considered by the Court. Consistent with the purpose of the Agreement, 'maintenance' is here by interpreted to mean that Defendant is solely required to maintain the easement in a functioning manner to allow the drainage negotiated through the Agreement to continue.

"The Court further finds that the term 'maintenance' does not contain an aesthetic component, as suggested by the Plaintiff. The Court notes that although homeowners

5

generally may find aesthetics to be important because they affect the value of their homes, the Court does not see any indication that aesthetics were contemplated when the contract was signed. The Court finds that some maintenance must happen to make sure the water from the drainage system flows. The Court looked at the term 'lake maintenance' in ¶ 3 of the Agreement and finds that the term 'lake' could hypothetically include banks, but that most people think of the water first when defining that term. Maintenance for the water would be to prevent anything being in the water, such as algae or other items that would potentially stop or slow water flow or the water itself.

"Finding that the term 'maintenance' was unambiguous, the Court does not utilize parol evidence in making its findings. However, the Court does note that even if it were to look at parol evidence, that evidence further supports Defendant's position that the contract only dealt with maintenance on the functionality of an easement to drain water. The Court notes that it reviewed the two letters provided by the parties in their briefing and will discuss both briefly. The first letter reviewed was from Dennis London to Clinton Koker dated December 6, 2004, which Plaintiffs rely upon in their parol evidence argument. The Court recognizes that the letter mentioned Plaintiffs advertising the property as having a scenic lakeside view, but notes that this mention only occurred during negotiations that contemplated a scenario under which the Plaintiff might actually become part of the Defendant homeowners' association, which Plaintiff ultimately rejected. The Court further notes that in the second letter contained in briefing, Clinton Koker responded to Dennis London and essentially accepted the Defendant's counterproposal offering only a drainage easement instead of HOA membership. In that second letter, there was no reference to aesthetics; rather, that letter included language that the ongoing annual lake maintenance fee 'would be used to ensure suitable drainage for the CRK Development.'"

The district court also granted Buckhead's counterclaim for a declaratory judgment that "[Buckhead's] obligation under the Agreement is solely to maintain the easement in a functioning manner to allow the drainage negotiated through the Agreement to continue, and that the Agreement does not contain an aesthetic component."

ANALYSIS

On appeal, CRK and Dwellings challenge whether the district court correctly granted summary judgment in Buckhead's favor and raise two issues: (1) whether the court erred in finding there was no breach of contract; and (2) whether the court should have relied on parol evidence. Resolution of both issues essentially comes down to interpreting the term "maintenance" as used in the contract, specifically whether the contract required Buckhead to maintain the aesthetic appearance of the storm water drainage easement.

*Our standard of review is de novo.*

Resolving the issues presented here involves the interpretation of the contract between CRK and Buckhead. An appellate court exercises unlimited review over the interpretation and legal effect of written instruments, and we are not bound by the lower court's interpretations or rulings. *Born v. Born*, 304 Kan. 542, 554, 374 P.3d 624 (2016). Likewise, "'the question of whether a written instrument is ambiguous is a question of law subject to de novo review.'" *National Bank of Andover v. Kansas Bankers Surety Co.*, 290 Kan. 247, 264, 225 P.3d 707 (2010).

Although CRK and Dwellings go to great lengths to discuss factual matters about the negotiations prior to the contract and the current cosmetic appearance of the east bank, the court based its decision only on the language of the contract. In other words, the court did not consider those facts material to its decision. In short, CRK and Dwellings abandon any challenge that there are genuine disputes as to any material fact precluding summary judgment by failing to brief that argument. See *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018) (issues not adequately briefed are considered waived or abandoned). As a result, the only question before this court is whether

Buckhead is entitled to judgment as a matter of law based on the clear language of the contract.

*The district court did not err in finding that there was no breach of contract.*

CRK and Dwellings argue that the district court erred in concluding that the contract unambiguously only required functional maintenance of the easement. They assert that the term maintenance also has an aesthetic component and so Buckhead breached its duty to maintain by allowing the east Bank to become overgrown with "trees, bushes, nocuous weeds, and grasses that twist and turn" and creating an environment for "unwanted vermin such as opossums and armadillos" to occupy the area. Buckhead responds that the clear intent of the parties was only to create a storm water drainage easement, so the only maintenance that needed to occur was to ensure that Buckhead fulfilled that purpose.

> *Courts will first look to the language of a contract to determine whether the intent of the parties is unambiguous.*

"'The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction.'" *Peterson v. Ferrell*, 302 Kan. 99, 104, 349 P.3d 1269 (2015). In addition,

> "'[a]n interpretation of a contractual provision should not be reached merely by isolating one particular sentence or provision, but by construing and considering the entire instrument from its four corners. The law favors reasonable interpretations, and results which vitiate the purpose of the terms of the contract to an absurdity should be avoided. [Citations omitted.]'" *Waste Connections*, 296 Kan. at 963.

By definition, an easement is an interest that one person has in the land of another. *Mid-America Pipeline Co. v. Wietharn*, 246 Kan. 238, 248, 787 P.2d 716 (1990) (citing *Potter v. Northern Natural Gas Co.*, 201 Kan. 528, 530, 441 P.2d 802 [1968]). "'The character and extent of the rights created by a grant of easement is determined by construction of the language of the grant and by the extent of the use made of the dominant tenement at the time of the grant.'" *City of Arkansas City v. Bruton*, 284 Kan. 815, 829, 166 P.3d 992 (2007).

So with that in mind, we turn to the language of the contract. Although the parties direct this court's attention to two specific provisions, as our Supreme Court held in *Waste Connections*, the court must consider the entire document. And upon full review, it becomes readily apparent that the express purpose of the contract was solely to create a storm water drainage easement with no requirement that Buckhead would maintain the aesthetic appearance of the east bank.

On the first page of the contract, the parties pointedly titled it "STORM WATER DRAINAGE EASEMENT AGREEMENT" and begin by identifying Buckhead and CRK as the parties to the contract. The contract then recognizes that the parties reached an agreement to create a storm water drainage easement because CRK was developing a residential real estate development "near or adjacent to Buckhead Lake and requires an easement *for the disposal of storm water drainage* into Buckhead Lake Reserve A." (Emphasis added.)

On the second page, Paragraph two contains the "Purpose of Easement" and provides:

> "*The purpose of this Agreement is to create a storm water drainage easement* on the east side of Buckhead Lake (Reserve A) providing *access for storm water drainage* from the [Dwellings]. BUCKHEAD LAKESIDE, on behalf of itself, successors, and

9

assigns hereby grants to CRK, its successors and assigns, a perpetual storm water drainage easement on the east side of Buckhead Lake Reserve A subject to the terms and conditions hereinafter set forth." (Emphases added.)

Paragraph three describes the consideration, specifically that CRK agreed to pay Buckhead $12,000 upon the execution of the contract and then $2,000 "annual lake payments . . . for its proportionate share of lake maintenance."

Paragraph four then provides that the members of Dwellings would remain separate from the members of Buckhead and vice versa. Paragraphs five and six discuss CRK's responsibilities for the construction and repair work on the easement, including that CRK would have to construct the easement and restore the landscaping, including "silt control measures during the construction phase of the easement" and "repair work on the east bank of Buckhead Lake to control erosion, including the addition of top soil, railroad ties and vegetation to change the pattern of the current drainage into Buckhead Lake."

The remaining paragraphs discuss the parties' separate authorities to enter the contract, require CRK to form an association for the neighborhood that would become The Dwellings, provide that the parties must record the easement by a deed that binds successors and assigns of the parties, allow amendment only by written and mutual consent, and provide that the contract will be governed by Kansas law.

Based on the language used, the parties' intent in entering the contract was to create an easement for storm water drainage only. By its express terms, the contract gave CRK a limited right to use Buckhead Lake for storm water drainage through the easement on the east bank. But as the parties note, whether the contract is ambiguous turns on the meaning of the term "maintenance," or more specifically "lake maintenance."

10

The dictionary defines "maintenance" to mean "upkeep, support, defense, etc.; specif., the work of keeping a building, machinery, etc. in good repair." Webster's New World College Dictionary 880 (5th ed. 2014). Similarly, to "maintain" something means "to keep in a certain condition or position, esp. of efficiency, good repair, etc.; preserve." Webster's New World College Dictionary 880 (5th ed. 2014). Based on these definitions and given the express purpose of the contract, it stands to reason that Buckhead's only obligation would be to keep Buckhead Lake in a condition of good repair so that it does not interfere with Dwellings' use of the easement.

It bears mentioning that CRK and Dwellings concede that maintenance unambiguously includes a functional component, but they disagree with the conclusion that maintenance has no aesthetic component. In particular, CRK and Dwellings assert the court defined "'aesthetic'" in relation to being "of beauty" instead of simply "pleasing in appearance," and that it would be "unimaginable" that any person could find the appearance of the east bank pleasing. While it may be true that a storm water drainage easement that functions correctly could also be "pleasing in appearance," those terms are not mutually exclusive. Moreover, the word "aesthetic" appears nowhere in the contract, so the definition of that term carries little weight when deciding what type of maintenance Buckhead had to perform.

That said, the contract does discuss restoration and landscaping, but those provisions strictly dealt with CRK's responsibilities related to the construction and repair of the easement. These provisions may authorize CRK and Dwellings to dictate their preferred method of erosion control, which would seemingly include the aesthetics of the east bank, but that particular question is beyond the scope of this appeal. This court is only tasked with deciding whether the contract *requires Buckhead* to ensure that the east bank is, as CRK and Dwellings describe it, aesthetically "pleasing in appearance." On that point, we find that the only reasonable interpretation of the maintenance provision in

11

the contract is that Buckhead must maintain Buckhead Lake to fulfill the express purpose of the contract—creating an easement for storm water drainage.

CRK and Dwellings also direct this court's attention to other terms used in the maintenance provision, for example, it specifically mentions annual payments are for a "proportionate share" of "lake maintenance." They also assert that the City of Wichita maintains the actual drainage system. But to support these arguments, CRK and Dwellings make factual assertions that are not found in the district court's statements of uncontroverted facts, and as mentioned above, CRK and Dwellings abandoned the argument that there are genuine disputes of material fact by failing to brief that argument. See *Williams*, 307 Kan. at 977. In addition, as Buckhead points out, these challenges were not raised below, and CRK and Dwellings fail to explain why we should consider them for the first time on appeal. See Supreme Court Rule 6.02(a)(5) (2021 Kan. S. Ct. R. 35) (requiring explanation for why an issue not raised below should be considered for first time on appeal); *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018) (holding that Rule 6.02 would be strictly enforced).

*CRK and Dwellings never raised a nuisance claim before the district court, so they cannot raise one on appeal.*

CRK and Dwellings also contend that Buckhead has a duty to maintain the appearance of the east bank because of its prior maintenance over the years. They contend that it breached its duty by letting the east bank become a nuisance. Thus, according to CRK and Dwellings, Buckhead should be liable for any damages since it created a "nuisance" by failing to properly maintain the east bank.

But CRK and Dwellings never raised a nuisance claim before the district court. As evident from the proceedings below, this case concerns competing claims for declaratory judgment and turns only on a matter of contract interpretation. Put simply, we continue to

reject any attempt to raise a new issue on appeal for the first time when a party fails to explain why we should consider it. See Supreme Court Rule 6.02(a)(5); *Daniel*, 307 Kan. at 430. Moreover, even if they could maintain a nuisance claim at this stage, CRK and Dwellings fail to explain what damages they have suffered as a result of the alleged nuisance on the east bank, since the contract only required functional maintenance.

In sum, for the purpose of the issues presented in this appeal, Buckhead's duty to maintain the east bank stems from the language of the contract. The express purpose of the contract was to create a storm water drainage easement and the contract required Buckhead to perform "lake maintenance." Given the context of the contract, maintenance can only reasonably be interpreted to mean maintaining the east bank to keep allowing the fulfillment of the express purpose of storm water drainage. And since it was uncontroverted that CRK and Dwellings had never identified any instance in which the storm water failed to drain properly, it cannot be said that Buckhead failed to fulfill this obligation or breached the contract. For these reasons, the district court did not err in granting summary judgment to Buckhead.

*The district court did not err in rejecting any reliance on parol evidence.*

CRK and Dwellings next argue that the district court erred in failing to consider parol evidence to establish the parties' intent. Because the district court agreed with Buckhead that the contract was unambiguous, it then concluded that considering more evidence detailing the parties' negotiations was unnecessary. See *Waste Connections*, 296 Kan. at 963 ("[If] the court determines that a written contract's language is ambiguous, extrinsic or parol evidence may be considered to construe it."). So unless CRK and Dwellings can show the court erred in finding the language was unambiguous on its face, we need not consider whether the court should have considered parol evidence in reaching that conclusion.

13

Even so, the district court also noted that parol evidence would not have changed its decision because the evidence offered supported Buckhead's position. The court noted that its review of two negotiation letters showed that the parties discussed the appearance of Buckhead Lake only in the context of negotiating whether the Dwellings would ultimately become part of Buckhead. Yet the second letter also did not mention aesthetics and seemed to acknowledge that the lake maintenance fee would be used only to ensure suitable drainage.

CRK and Dwellings now assert the district court erred in reaching this conclusion because it only "looked at one letter and did not give any witnesses a chance to explain what actually happened during negotiations." First, this assertion misstates the number of letters discussed by the court. But more to the point, CRK and Dwellings overlook that the court based its decision on the actual context surrounding each letter.

Although the district court did not mention it, our review of the initial letter from October 8, 2004, from Clinton Koker to Dennis London—the owner of CRK and the president of Buckhead, respectively—helps establish the full context of the negotiations. In that letter, Koker proposed that the lots being developed by CRK would join Buckhead and pay a proportionate share of maintenance and repair costs to Buckhead Lake.

In a letter dated December 6, 2004, to Koker, London rejected the original offer for the CRK development properties to join Buckhead. Instead, London offered a counterproposal that would see only the lakeside properties joining Buckhead and paying a proportionate share of the "special assessment fees levied to the lakeside homeowners in 2004 to address erosion control," in the amount of a one-time lump-sum payment of $23,887. Within a breakdown of those fees, Buckhead proposed a "drainage access fee to offset a proportionate amount of the lakeside common area costs that were included in the higher lakeside lot costs and accordingly apply to the CRK development which advertises and realizes a scenic lakeside view."

14

In a response letter dated December 19, 2004, to London, Koker offered a counterproposal. Instead of homeowners of CRK development properties joining Buckhead, Koker proposed a "one-time special assessment to [Buckhead] of $12,000 for rights to drain into [Buckhead Lake]" and an "annual maintenance/drainage fee of $2,000 . . . to address potential long-term lake maintenance issues to ensure suitable drainage for the CRK development." Buckhead formally accepted this counteroffer in a letter dated January 4, 2005, pending final approval by a majority vote of Buckhead members. Eventually the parties executed the contract in July 2005, formalizing the terms offered in the December 19, 2004 letter.

Put simply, the district court did not err in finding that the outcome would not have changed even after considering parol evidence of the negotiations between the parties. Although Buckhead may have been aware of CRK's interest in the lakeside views, CRK opted not to obtain access rights to Buckhead Lake by rejecting the counteroffer for the lakeside properties to join Buckhead. Thus, the final contract reached between the parties shows that CRK's access to Buckhead Lake would only be for the limited purpose of a storm water drainage easement.

Because we find no ambiguity in the contract, we affirm the district court's summary judgment ruling. And because the contract was unambiguous, the district court did not need to consider parol evidence about the parties' negotiations. But even if it had, the district court correctly concluded that the outcome would not have been different since the express purpose of the contract was to create a storm water drainage easement.

Affirmed.

15