NOT DESIGNATED FOR PUBLICATION

Nos. 121,566
121,567

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ALLEN, GIBBS & HOULIK, L.C.; AGH WEALTH ADVISORS, L.L.C.,
TRUSTED ADVISORS, L.L.C.; and DONALD J. GLENN d/b/a Don Glenn Registered
Representative,
*Appellees*,

v.

MARK R. RALSTON and KAY A. WHITE,
*Appellants*.


MEMORANDUM OPINION

Appeal from Sedgwick District Court; ERIC A. COMMER, judge. Opinion filed November 5, 2021.
Affirmed in part, reversed in part, vacated in part, and remanded with directions.

*Charles E. Millsap* and *Lyndon W. Vix*, of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita,
and *Joseph B. Alonso*, pro hac vice, and *Daniel H. Wirth*, pro hac vice, of Gregory, Doyle, Calhoun &
Rogers, L.L.C., of Marietta, Georgia, for appellants.

*Terry L. Mann* and *Greg A. Drumright*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of
Wichita, for appellees.

Before ATCHESON, P.J., BRUNS and ISHERWOOD, JJ.


PER CURIAM:  Mark R. Ralston and Kay A. White both filed appeals after a jury
rendered a verdict against them for breach of their employment agreements, conversion
of property, and breach of their fiduciary duties of loyalty. At trial, the jury awarded
damages in favor of Allen, Gibbs & Houlik, L.C., AGH Wealth Advisors, L.L.C., and
Donald Glenn in excess of $2.2 million. In addition, the district court awarded attorney

1

fees in excess of $600,000. Although the plaintiffs docketed a cross-appeal, it has now been voluntarily waived. Moreover, after the parties presented oral argument, we consolidated these appeals for decision because they involve common questions of fact and issues of law.

On appeal, Ralston and White assert several errors by the district court arising out of pretrial, trial, and posttrial proceedings. Likewise, Ralston and White contend that the district court's award of contractual attorney fees was excessive and unreasonable. Based on our review of the record on appeal in light of Kansas law, we affirm the jury's verdict on the breach of contract claims; we reverse the jury's verdict on the conversion of property and breach of fiduciary duty claims; we vacate the award of attorney fees; and we remand the issue of contractual attorney fees to the district court for reconsideration consistent with this opinion.

FACTS

*The Parties and Related Entities*

Allen, Gibbs & Houlik, L.C. (Allen Gibbs) is an accounting and financial services firm located in Wichita. Allen Gibbs and its affiliated companies provide various accounting, tax, business consulting, employee benefits, wealth management, and several other services to clients. Allen Gibbs is not a registered securities broker-dealer nor is it a registered investment advisor. As a result, Allen Gibbs works with licensed securities broker-dealers and registered investment advisors in effecting transactions in securities for the firm's clients.

AGH Wealth Advisors, L.L.C. (AGH Wealth) is a financial advisory company created in 2007. It serves as a "portfolio manager" and became a registered investment advisor firm in 2008 to provide investment advisory services to clients. Even so, AGH

2

Wealth is not licensed as a broker-dealer and cannot purchase or sell securities on behalf of its clients. For that reason, it contracts with licensed securities broker-dealers to provide brokerage services to its clients.

Donald Glenn is a certified public accountant and an officer of Allen Gibbs, where he directs the firm's tax department. Glenn is also a registered representative of LPL Financial, L.L.C. (LPL Financial), which provides brokerage services to AGH Wealth. In this capacity, Glenn could receive a portion of the commissions generated by LPL Financial for the services the firm provided to AGH Wealth's clients. Glenn was not a party to the employment agreements at issue.

Ralston is a licensed securities broker-dealer and financial advisor. In 2003, Ralston entered into an employment agreement with Allen Gibbs, Trusted Advisors, L.L.C. (Trusted Advisors), and their affiliated companies. Around the same time, he transferred his securities registration to MML Investors Services, Inc. (MML Investors). Ralston later transferred his securities registration from MML Investors to LPL Financial. Like Glenn, Ralston was a registered representative of LPL Financial and received commissions generated by the firm for the services it provided to AGH Wealth's clients. Ralston left Allen Gibbs in 2012 and began working with Morgan Stanley Smith Barney (Morgan Stanley).

White is also a licensed broker-dealer and financial advisor. In 2003, White joined Ralston in leaving their previous employer and entered into an employment agreement with Allen Gibbs. She had previously served as Ralston's administrative assistant at another firm, and Allen Gibbs hired her to serve in a similar position for Ralston and others. Like Glenn and Ralston, White also served as a registered representative of LPL Financial. In 2012, she left Allen Gibbs with Ralston to join Morgan Stanley.

Trusted Advisors was a registered investment advisory firm when Ralston and White were employed with Allen Gibbs. The company was a party to the employment agreement entered into by Allen Gibbs and Ralston. Yet it was not a party to the employment agreement entered into by Allen Gibbs and White. Although the petition named Trusted Advisors as a plaintiff, it is no longer in business and has been dismissed as a party to these consolidated cases.

LPL Financial—which is not a party to this appeal—is a registered investment advisory firm and a licensed securities broker-dealer. In 2008, AGH Wealth and LPL Financial entered into an advisory program agreement. Under the agreement, LPL Financial provided brokerage and related services to AGH Wealth's clients. These services included maintaining client information, sending account statements to clients, and receiving payments from clients. LPL Financial passed on a portion of the commissions and fees generated by the accounts of these clients to AGH Wealth, Ralston, and Glenn.

*The Employment Agreements*

<u>*White's Employment Agreement*</u>

On December 5, 2003, White entered into an employment agreement with Allen Gibbs and its affiliated companies. The agreement stated that it was intended "to delineate the conditions of employment and the duties and responsibilities of the parties to each other both during and after employment." The agreement provided—among other things—that Allen Gibbs would employ White "to perform such duties and services as may from time to time be assigned" and she agreed to "devote [her] entire attention and energies to the business of the Employer during the hours [she] is required or expected to be performing services for the Employer. . . ." Under the agreement, either party could

4

terminate the employment "in writing, at least fourteen (14) days prior to the date on which the termination is to be effective. . . ."

Under the agreement, White acknowledged "that the names, addresses, records and files of the Employer's Clients, and any information disclosed to or discerned by the Employee in consequence of employment . . . regarding the Employer's products, systems, processes and services are . . . Confidential Information. . . ." She also acknowledged that such records and information "are valuable, special and unique assets of the Employer's business unless such information is generally known or could be readily ascertainable by the Employee, absent [her] employment with the Employer." As a result, White agreed both "during the term of [her] employment . . . and at all times after the termination of employment, the Employee shall not directly or indirectly, use, disseminate, or disclose any Confidential Information, except as may be required in the performance of [her] duties . . . during the term of employment."

White's agreement also provided that "[a]fter termination of employment with the Employer, the Employee agrees that for a period of twenty-four (24) months, commencing on the date of termination, [she] shall not provide services to the Employer's clients." White agreed that she would "not, directly or indirectly, solicit, contact, advise, visit or otherwise cause the Employer's Clients . . . to become Clients of the Employee or any firm, company, corporation, or other business entity in which the Employee has an interest, either as an employee, owner or otherwise. . . ." The employment agreement also provided for White to make "Payment for Clients" if "the Employer loses a Client within [a] period of twenty-four (24) months . . . as a result of that Client being serviced by the terminated Employee or [her] firm, corporation, other employer, or entity. . . ."

The parties to the employment agreement also recognized "that a breach of this agreement will result in damage that will be impractical to determine with precision." The parties thus agreed to "liquidated damages for any breach of this contract" and also

5

agreed "to establish this sum as a fair approximation of damages which either party will sustain in the event of a breach of the agreement." Moreover, the employment agreement allowed for the recovery of "reasonable attorneys' fees . . . if the Employer prevails in any action brought pursuant to [the Non-Disclosure of Information] Section." Finally, the parties agreed that the employment agreement "shall not be construed in favor of or against either party" and the parties represented that they "have read this agreement, understand it, and agree to be bound by its terms."

### *Ralston's Employment Agreement*

On December 15, 2003, Ralston entered into the employment agreement with Allen Gibbs, Trusted Advisors, and their affiliated companies. Although the terms of Ralston's employment agreement were much like those of White's employment agreement, the two agreements are not identical. For example, Trusted Advisors was only listed as a party in Ralston's agreement, and the services listed as being provided by the Employer in Ralston's agreement include "wealth management" while it is not listed in White's agreement. Furthermore, while White's agreement does not designate the specific services she was to provide to the Employer, Ralston's agreement specifies that he was being employed "to serve as a financial planner and advisor." It also provided that his duties included "managing clients' investments, assisting clients in selecting financial instruments that meet their goals, and providing investment education for clients and employees of the Firm."

Like White's agreement, the parties to Ralston's agreement acknowledged the intent "to delineate the conditions of employment and the duties and responsibilities of the parties to each other both during and after employment." Ralston agreed that he "shall not, other than on behalf of the Employer, perform any services which the Employer now offers or provides, or may hereafter offer or provide." Ralston also agreed to "devote [his] entire attention and energies to the business of the Employer during the hours [he] is

6

required or expected to be performing services for the Employer. . . ." Under Ralston's agreement, either party could terminate the employment "in writing, at least thirty (30) days prior to the date on which the termination is to be effective. . . ."

As White did, Ralston acknowledged in his agreement "that the names, addresses, records and files of the Employer's Clients, and any information disclosed to or discerned by the Employee in consequence of employment . . . regarding the Employer's products, systems, processes and services are . . . Confidential Information. . . ." He also acknowledged that such records and information "are valuable, special and unique assets of the Employer's business unless such information is generally known or could be readily ascertainable by the Employee, absent [his] employment with the Employer." As a result, Ralston agreed both "during the term of [his] employment . . . and at all times after the termination of employment, the Employee shall not directly or indirectly, use, disseminate, or disclose any Confidential Information, except as may be required in the performance of [his] duties . . . during the term of employment."

Ralston also agreed that "after termination of employment with the Employer, [the Employee] agrees that for a period of twenty-four (24) months, commencing on the date of termination, [he] shall not provide services to the Employer's clients." Moreover, Ralston agreed that he would "not, directly or indirectly, solicit, contact, advise, visit or otherwise cause the Employer's Clients . . . to become Clients of the Employee or any firm, company, corporation, or other business entity in which the Employee has an interest, either as an employee, owner or otherwise. . . ." The employment agreement also provided for Ralston to make "Payment for Clients" if "the Employer loses a Client within a period of twenty-four (24) months . . . as a result of that Client being serviced by the terminated Employee or [his] firm, corporation, other employer, or entity. . . ." In addition, Ralston agreed that he would "not solicit to hire employees of the Employer . . . for a period of two (2) years from the date [the] Employment is terminated."

7

Consistent with White's agreement, the parties to Ralston's agreement recognized "that a breach of this agreement will result in damage that will be impractical to determine with precision." The parties therefore agreed to "liquidated damages for any breach of this contract" and also agreed "to establish this sum as a fair approximation of damages which either party will sustain in the event of a breach of the agreement." Moreover, the Employment Agreement allowed for the recovery of "reasonable attorneys' fees . . . if the Employer prevails in any action brought pursuant to [the Non-Disclosure of Information] Section." Lastly, the parties agreed that the employment agreement "shall not be construed in favor of or against either party" and the parties represented that they "have read this agreement, understand it, and agree to be bound by its terms."

Unlike White's agreement, Ralston's agreement included two addenda. Addendum A provided—among other things—that Ralston would "register as a licensed representative of MML Investors Services, Inc.," and he agreed to service all clients jointly with Glenn, who was a registered representative of MML Investors. And Ralston agreed to evenly split his commissions with Glenn. In addendum B, the parties set out the terms for Ralston to continue to service any of the clients he brought with him from his previous employer if he left his employment with Allen Gibbs and its affiliated companies within the first four years. After the four-year period had expired, Ralston was bound by the terms of the employment agreement regarding the non-solicitation of clients.

*Progression of Relationship Between the Parties*

In 2008, the parties amended addendum A of Ralston's employment agreement. The amended addendum defined "AGH" to mean "Allen, Gibbs & Houlik, L.C. and any of its affiliates including but not limited to Allen, Gibbs & Houlik, L.C., AGH Solutions, and AGH Wealth Advisors, LLC." Moreover, Allen Gibbs, AGH Wealth, and Ralston signed the amended addendum A. Among other things, the amended addendum A

8

changed the revenue sharing structure between Ralston and Glenn. The other provisions of the employment agreement remained unchanged.

As discussed above, AGH Wealth was created as a financial advisory company in 2007 and became a registered investment advisor in 2008. AGH Wealth focuses on providing wealth management and investment advice to clients. But it is not registered as a broker-dealer and cannot purchase or sell securities. Around the same time, AGH Wealth entered into an advisory program agreement with LPL Financial. As a result, Ralston and White transitioned from MML Investors to LPL Financial. In turn, their clients moved their accounts to LPL Financial. As part of the transition, Glenn and Ralston both became registered representatives of LPL Financial. Later, AGH Wealth, Glenn, Ralston, and LPL Financial signed numerous LPL client agreements.

In September 2008, LPL Financial signed the protocol for broker recruiting as did Morgan Stanley and many other securities brokerage firms. Under certain circumstances, the protocol allows registered representatives to move from one broker-dealer or registered investment advisory firm to another without incurring liability. The protocol is intended to simplify the transition process—including the use of client information— when a registered representative moves between firms that are signatories to the agreement. It contains specific procedures and limits the client information that can be taken from one firm to another. Firms that agree to the protocol must permit transitioning registered representatives to take certain types of information relating to clients to another firm that has agreed to the protocol without facing the threat of litigation.

In July 2012, Ralston informed White that he was considering terminating his employment with Allen Gibbs and its affiliated companies to become an employee of Morgan Stanley. Ralston invited White to join him, and she agreed. While still employed at Allen Gibbs, Ralston and White negotiated with Morgan Stanley. At the direction of Ralston, White began preparing an Excel spreadsheet containing client information. In

9

obtaining the client information, White used her work computer and bypassed several security measures to obtain information shared with LPL Financial.

Likewise, Ralston—who was still employed at Allen Gibbs and its affiliated companies—accessed a different computer system to obtain information regarding certain 401(k) retirement plans. There is no allegation that LPL Financial was involved in the management of these 401(k) plans. There is also nothing in the record to suggest that information related to these plans was ever in the possession of LPL Financial.

On July 27, 2012, Ralston and White terminated their employment with Allen Gibbs and its affiliated companies. On the same day, they began working for Morgan Stanley. Although Ralston and White submitted letters of resignation, White had already left the office with the flash drive containing the information she had downloaded. White then provided this information to Morgan Stanley. That afternoon, Morgan Stanley began mailing solicitation letters to the AGH Wealth clients identified by Ralston and White. White also began contacting some of the clients to encourage them to transfer their accounts to Morgan Stanley.

*The Lawsuit*

On August 2, 2012, Allen Gibbs filed a petition in Sedgwick County against White. The petition alleged that White had breached the terms of her employment agreement by failing to provide 14 days' notice prior to the termination of her employment, by disclosing confidential information, and by soliciting clients to transfer their accounts to Morgan Stanley. AGH also asserted claims against White for conversion, tortious interference with prospective business relationship, breach of duty of loyalty, faithless servant, and misappropriation of trade secrets under the Kansas Uniform Trade Secrets Act, K.S.A. 60-3320 et. seq. Later, the petition was amended to include

AGH Wealth, Trusted Advisors, and Glenn as plaintiffs. In addition, the amended petition contained a claim for conspiracy.

On September 11, 2012, Allen Gibbs, AGH Wealth, Trusted Advisors, and Glenn sued Ralston. The petition alleged that Ralston had breached his employment agreement by failing to give 30 days' notice before terminating his employment, by soliciting White to join him at Morgan Stanley, by disclosing confidential information, by soliciting clients to transfer their accounts to Morgan Stanley, and by failing to meet certain financial planning goals set forth in the 2008 version of addendum A. In addition, the petition asserted claims against Ralston for conversion, tortious interference with prospective business relationship, breach of duty of loyalty, faithless servant, misappropriation of trade secrets under the Kansas Uniform Trade Secrets Act, and conspiracy. The petition also alleged that Ralston violated the term commitment note, under which Allen Gibbs and AGH Wealth had loaned him money.

In response to the petition, Ralston filed a counterclaim, alleging the plaintiffs had breached the terms of his employment agreement by failing to pay him certain amounts owed. Later, the cases were consolidated and several different district court judges presided over pretrial matters. Although both Ralston and White filed motions for judgment on the pleadings and motions for summary judgment, all the motions were denied with one exception: the district court granted Ralston and White summary judgment against Trusted Advisors, and the firm was dismissed as a party.

Following a final pretrial conference, the district court entered a pretrial conference order on November 10, 2016. In setting forth their damage claims against Ralston and White in the pretrial order, Allen Gibbs, AGH Wealth, and Glenn referred to themselves collectively as "AGH," and made no attempt to itemize the claims being asserted or the damages being claimed by each. Likewise, the parties did not itemize the damages allegedly caused by Ralston and those allegedly caused by White. Among other

11

things, Ralston and White asserted in the pretrial order that the plaintiffs could not recover both compensatory damages and liquidated damages. Moreover, the parties requested an award of attorney fees should they prevail on their respective contractual claims.

*The Jury Trial*

On April 24, 2017, the district court began a 17-day jury trial. Before trial, the plaintiffs filed a motion in limine to preclude any reference in front of the jury to the protocol for broker recruiting signed by LPL Financial and Morgan Stanley. In granting the motion, the district court determined that because the parties to this consolidated action were not parties to the protocol, all references to the protocol should be redacted from the exhibits and no mention of the protocol should be made in the presence of the jury. At trial, the district court ultimately allowed a small portion of Ralston's contract with AGH Wealth and Glenn that referenced the protocol to be presented to the jury without redaction. Even so, the district court instructed the jury that the protocol "shall not be considered by you with respect to Allen, Gibbs & Houlik L.C. or AGH Wealth Advisors' claims against Ralston or White for breaches of their Employment Agreements."

A review of the trial record reveals that in addition to the testimony of the parties and several other witnesses, the district court admitted 131 exhibits into evidence. Given the extensive record on appeal, we will not set out the evidence presented at trial in detail. Instead, we will discuss the evidence material to the issues presented on appeal in the analysis section of this opinion. After considering the evidence, hearing the arguments of counsel, receiving instructions from the court, and deliberating, the jury returned a special verdict form in which it answered 31 questions.

12

The jury found that Ralston had breached his employment agreement by failing to give the required 30 days' notice of termination, by soliciting White to join him at Morgan Stanley, and by taking confidential information and disclosing it to Morgan Stanley. As a result, the jury awarded Allen Gibbs and/or AGH Wealth the sum of $381,706.31 in liquidated damages under section 13 of his employment agreement. The jury also found that Ralston had breached his employment agreement by soliciting or providing services to clients of AGH Wealth within 24 months after his resignation and awarded AGH Wealth an additional sum of $159,177.65 in damages under section 11 of his employment agreement. The jury also found that Ralston breached his fiduciary duty of loyalty and awarded $60,000 to the plaintiffs.

Likewise, the jury found that White had breached her employment agreement by failing to give the required 14 days' notice of termination, by failing to devote her entire attention and energies to her employer, and by taking confidential information from Allen Gibbs and AGH Wealth and disclosing it to Morgan Stanley. As a result, the jury awarded Allen Gibbs the sum of $50,066 in liquidated damages under section 13 of her employment agreement. The jury also found that White breached her fiduciary duty of loyalty and awarded $8,000 to the plaintiffs.

Furthermore, the jury found that both Ralston and White had converted the plaintiffs' property and awarded the plaintiffs the sum of $1,571,700 in damages. Although the jury also found that Ralston breached a personal financial planning obligation, it did not award any damages to the plaintiffs for this breach. As to the remaining claims asserted by the plaintiffs—including the claims violation of the Computer Fraud and Abuse Act, faithless servant, and conspiracy—the jury found for Ralston and White. The district court did not submit the claim that Ralston and White violated the Kansas Uniform Trade Secrets Act because Allen Gibbs, AGH Wealth, and Glenn elected not to proceed under that theory.

13

On Ralston's counterclaim, the jury found that Allen Gibbs and/or AGH Wealth had also breached the terms of its employment agreement. Even so, it also found that AGH Wealth had substantially performed its obligations under the agreement. Consequently, the jury awarded $14,778.63 to Ralston for Allen Gibbs and/or AGH Wealth's breach of the agreement.

*Posttrial Rulings and Filing of Appeal*

After resolving a dispute between the parties regarding the language to be used, the district court entered a journal entry of judgment on February 8, 2018. Before executing the journal entry, the district court entered an order awarding attorney fees in the amount of $605,000. Of this amount, the district court awarded $15,125 against both Ralston and White in favor of Allen Gibbs; $182,528.50 against Ralston in favor of Allen Gibbs and AGH Wealth; and $407,346.50 against Ralston in favor of Allen Gibbs, AGH Wealth, and Glenn. The district court awarded these fees under the provisions of Ralston's and White's employment agreements that allowed for the recovery of "reasonable attorney fees" if the employer prevails in an action to enforce the terms of the agreements.

Even though attorney fees could be awarded only on the breach of contract claims, the district court found that the various claims asserted by the plaintiffs were "inextricably intertwined" with each other. As a result, the district court did not require counsel to apportion their time for the professional services performed to pursue the contract claims versus the tort claims nor for the professional services performed to pursue the successful claims versus the unsuccessful claims. The district court also did not explain in its order how Glenn—who was not an "Employer" under the terms of the employment agreements and was not a party to the breach of contract claims—could recover contractual attorney fees.

14

On March 5, 2018, Ralston and White filed post-judgment motions asserting several issues. The district court held a hearing on the motions on June 28, 2018. Even so, the district court did not enter a Memorandum Decision and Order denying the motions until May 7, 2019. Following the denial of the post-judgment motions, Ralston and White filed timely notices of appeal. In response, Allen Gibbs, AGH Wealth, and Glenn filed a cross-appeal, but it was subsequently waived. We held oral arguments on September 9, 2021. Because the plaintiffs waived the cross-appeal, the appeals arise out of nearly identical facts, and the issues presented on appeal are substantially similar, we consolidated Ralston's and White's appeals on September 21, 2021.

ANALYSIS

*Breach of Contract Claims*

*Standard of Review*

The first issue presented on appeal is whether the district court erred as a matter of law by failing to grant Ralston's and White's judgment as a matter of law on the breach of contract claims. Because the interpretation and effect of a written agreement involves a question of law, our review is unlimited. Moreover, our review is unaffected by the district court's interpretation. *Born v. Born*, 304 Kan. 542, 554, 374 P.3d 624 (2016). In interpreting a written agreement, the primary rule is to determine the intent of the parties. If the agreement is unambiguous, we determine the intent of the parties from the language of the contract without applying rules of construction. Ultimately, whether a party breached one or more provisions of a written agreement is a question of fact. *Peterson v. Ferrell*, 302 Kan. 99, 104, 349 P.3d 1269 (2015).

In interpreting the provisions of a written agreement, we do not isolate a particular word, sentence, or provision. Instead, we are to construe and consider the language used in the whole agreement. *Thoroughbred Assocs. v. Kansas City Royalty Co.*, 297 Kan.

15

1193, 1206, 308 P.3d 1238 (2013). The law also favors a reasonable interpretation of written agreements, and we are to avoid an interpretation that invalidates the purpose of the agreement. *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 963, 298 P.3d 250 (2013). Additionally, we are not to find a disputed term in a written agreement to be ambiguous unless the intent of the parties cannot be determined under a reasonable interpretation. *Geer v. Eby*, 309 Kan. 182, 192, 432 P.3d 1001 (2019).

### *Purpose of the Employment Agreements*

To guide our analysis, we review both Ralston's employment agreement and White's employment agreement to determine the parties' intended purpose for entering into the agreements. On the face of both agreements, the parties made clear that their mutual intent was for the employment agreements to control their respective "duties and responsibilities . . . to each other *both during and after employment. . . .*" (Emphasis added.) In other words, the purpose of entering into the employment agreements was not only to regulate the relationship of the parties during Ralston's and White's employment, but also to regulate the procedures followed in the event of termination, as well as the obligations of the parties after termination.

Significantly, the parties also expressed the mutual intent of the parties was to restrict Ralston and White from competing with their former employer and to protect confidential information from being disseminated after their employment with Allen Gibbs and its affiliated companies ended. In Kansas, such restrictive provisions in contracts of employment are generally upheld when they protect a legitimate business interest of the employer, when they do not unduly burden the employee, when they do not violate the public welfare, and when they contain reasonable limitations. See *Idbeis v. Wichita Surgical Specialists, P.A.*, 279 Kan. 755, 770, 112 P.3d 81 (2005); see also *Weber v. Tillman*, 259 Kan. 457, 474, 913 P.2d 84 (1996) ("the paramount public policy is that freedom to contract is not to be interfered with lightly").

Ralston and White do not contend that the terms of their employment agreements are unreasonable or that they violate public policy. Accordingly, we presume that the terms of the agreements are reasonable, and the parties mutually intended to protect legitimate business interests. Instead, we focus on interpreting the employment agreements in a reasonable manner that validates the purpose of the agreements as well as the intent of the parties.

### *AGH Wealth was an Employer*

Ralston argues that AGH Wealth was not an "Employer" entitled to relief for breach of his employment agreement. This argument applies only to Ralston because the breach of contract judgment against White was solely in favor of Allen Gibbs and not AGH Wealth. The jury determined that Ralston breached the terms of his employment agreement in several ways. In particular, the jury found that Ralston breached his employment agreement by taking confidential information of Allen Gibbs and/or AGH Wealth and disclosing it to Morgan Stanley in violation of section 9 of the agreements. The jury also found that Ralston provided services to and/or solicited the clients of AGH Wealth in violation of section 10.B of his agreement.

Ralston's employment agreement defines the term "Employer" to include not only Allen Gibbs and Trusted Advisors but also "their affiliated companies. . . ." In interpreting a written agreement, we give the words used their common or customary meaning. *Pfeifer v. Federal Express Corp.*, 297 Kan. 547, 550, 304 P.3d 1226 (2013). The common definition of the term "affiliated" is "closely associated with" or "related" to one another. See Merriam-Webster Dictionary, *available at* https://www.merriam-webster.com/dictionary/affiliated; see also Black's Law Dictionary 72 (11th ed. 2019) (an "affiliate" is "[a] corporation that is related to another corporation by shareholdings or other means of control. . . ."). Accordingly, we conclude that under the terms of his

17

employment agreement, Ralston was also obligated to other companies that were closely associated with or related to Allen Gibbs.

In addition, Allen Gibbs, AGH Wealth, and Ralston signed the 2008 amendment to addendum A of the employment agreement providing that it "modifies and replaces Addendum A of the Employment Agreement between Allen, Gibbs & Houlik, L.C. and its affiliates (AGH or the Firm) and Mark R. Ralston (Employee) and is effective January 1, 2008." It also provides that "[a]ll other provisions contained [in] the referenced Employ[ment] Agreement remain unchanged and in full force and effect." It then defines "AGH" to include "Allen, Gibbs & Houlik, L.C., AGH Solutions, and AGH Wealth Advisors, LLC."

We agree with Ralston that the 2008 amendment to addendum A of the employment agreement does not change the contractual definition of the term "Employer" as used in Ralston's employment agreement. Even so, we find that addendum A helps us interpret the terms of the employment agreement in a reasonable manner. In particular, it clarifies the companies that were "affiliated" with Allen Gibbs when Ralston and White terminated their employment in 2012. Thus, in interpreting the agreement as a whole and in a reasonable manner, we conclude that AGH Wealth was an "Employer" under the terms of Ralston's employment agreement.

### Prohibition Against Solicitation

Ralston asserts that even if AGH Wealth is found to be an "Employer" under his employment agreement, he was not prohibited from providing broker-dealer or registered investment adviser services to the clients of his former employer. In support of this argument, Ralston points us to a provision in paragraph 10.B of his employment agreement stating that for a period of 24 months after termination, he was prohibited from soliciting his former employer's clients for "services or products that are the same in

18

general categories as those which the Employer *now* offers or provides to its Clients." (Emphasis added.) Ralston argues that this provision only prohibited him from soliciting Allen Gibbs' clients for services that were being offered prior to he and White becoming employees of the firm and did not prohibit him from soliciting clients for broker-dealer or registered investment adviser services.

We reiterate that our review is unaffected by the district court's interpretation. *Born*, 304 Kan. at 554. Rather, we must independently consider the language used in the agreement—when reviewed as a whole—and not merely consider one provision in isolation. *Thoroughbred Assocs.*, 297 Kan. at 1206. We must also avoid an interpretation of the employment agreement that invalidates its purpose. *Waste Connections of Kansas, Inc.*, 296 Kan. at 963. Reviewing Ralston's agreement under these standards, we find his argument that he was never prevented from soliciting his former employer's clients for broker-dealer or registered investment adviser services to be both unreasonable and inconsistent with the purposes of his employment agreement.

As discussed above, Ralston's employment agreement identified several business activities other than tax and accounting in which Allen Gibbs and its affiliates were engaged when the agreement was executed in 2003. These services expressly included "wealth management and other consulting services and products . . . ." In fact, it is undisputed that Ralston—who is not an accountant—was being hired to perform these types of services. In particular, Allen Gibbs and its affiliates hired Ralston to provide securities broker-dealer and registered investment adviser services to existing and future clients. Accordingly, we find that it would have been unreasonable for the parties to the employment agreement to intend to only restrict Ralston from soliciting clients for accounting services that he could not and was not expected to provide.

Also, the word "now" commonly means "at the present time; at this moment" and does not refer to the past. Webster's New World College Dictionary 1002 (5th ed. 2014).

19

Here, at the moment the employment agreements were executed by the parties, Allen Gibbs and its affiliates were providing the types of services offered by Ralston and White precisely because they had begun providing the services upon signing them. Consequently, we conclude from the plain and unambiguous language of Ralston's employment agreement that the parties intended to restrict Ralston from soliciting the clients of Allen Gibbs and its affiliated companies—including those clients receiving broker-dealer and registered investment adviser services—after his employment ended. Any other interpretation would render the employment agreement meaningless.

### *Protected Confidential Information*

In their employment agreements, both Ralston and White agreed their work with Allen Gibbs and its affiliates would require "a high degree of trust and confidence by the Employer with existing and future clients of the Employer" and that "such clients are an asset of the Employer upon which the Employer relies for its income . . . ." So Ralston and White knew or should have known when they executed their respective employment agreements that Allen Gibbs and its affiliates would be providing them with access to confidential information regarding clients that their employer sought to protect from disclosure.

Furthermore, Ralston and White acknowledged in section 9 of their respective agreements:

> "[T]he names, addresses, records and files of the Employer's Clients, and any information disclosed to or discerned by the Employee in consequence of employment . . . regarding Employer's products, systems, processes and services are referred to collectively as Confidential Information and are valuable, special and unique assets of the Employer's business unless such information is generally known or could be readily ascertainable by the Employee, absent his/her employment with the Employer."

20

Section 9 continues:

> "In recognition of the foregoing, the Employee agrees that during the term of employment with the Employer, and at all times after the termination of employment, the Employee shall not, directly or indirectly, use, disseminate, or disclose any Confidential Information, except as may be required in the performance of his/her duties for the Employer during the term of employment. Upon termination of employment with the Employer, any and all manuals, notebooks, files, records, client lists and other documents which contain, describe or explain any Confidential Information, whether prepared by the Employee or others, shall be left with the Employer."

We conclude that the definition of "Confidential Information" used in the employment agreements is broad enough to include the type of client information confidentially shared with LPL Financial in order for Allen Gibbs and AGH Wealth to provide services to their clients.

Ralston and White acknowledge that some of the people or entities included on the client lists that they disclosed to Morgan Stanley were clients of Allen Gibbs and/or AGH Wealth. Likewise, they do not dispute that some of the information they took and disclosed to their new employer involved 401(k) plans under AGH Wealth's management, and nothing in the record suggests that this information was ever in the possession of LPL Financial. At the very least, Ralston's and White's disclosure or dissemination of this information to Morgan Stanley was sufficient to support the district court's decision to present the breach of contract claims to the jury and to support the jury's ultimate determination that Ralston and White materially breached the terms of their employment agreements.

### *Exclusion of Evidence Regarding Protocol*

Ralston and White also argue that the district court erred by not granting them judgment as a matter of law based on the "Protocol for Broker Recruiting" that both LPL

Financial and Morgan Stanley signed in September 2008. As discussed above, numerous securities brokerage firms signed the protocol that allows registered representatives to move from one broker-dealer or registered advisory firm that has signed the document to another that has also signed the document without incurring liability. In other words, firms that agree to the protocol must permit registered representatives to take certain types of information relating to clients from one firm that has agreed to the protocol to another firm that has agreed to the protocol.

Here, none of the parties to Ralston's and White's employment agreements have signed the protocol. Moreover, after the protocol was signed by LPL Financial and Morgan Stanley—neither of which is a party to this litigation—the parties did not amend the employment agreements to reflect that the protocol should be considered part of the agreements. We find that the employment agreements between Ralston, White, Allen Gibbs, and AGH Wealth controlled the relationship between the parties. In particular, the parties specifically agreed that they intended the employment agreements "to be the complete and final understanding between the parties . . . relating to the subject matter of [the] Agreement[s]." Thus, because the protocol is not part of the employment agreements and was not signed by the parties to this action, we conclude that the district court did not err in entering an order in limine or otherwise restricting the admission of evidence about the protocol at trial.

*Award of Damages for Breach of Contract*

Ralston and White suggest that Allen Gibbs and/or AGH Wealth did not establish that they sustained any damages as a result of the various breaches of the employment agreements found by the jury. In particular, Ralston argues that Allen Gibbs and/or AGH Wealth did not prove that they were damaged by his failure to give 30 days' notice of his termination in violation of section 2 of his employment agreement or by soliciting White to work with him at Morgan Stanley in violation of section 10.C of his employment

22

agreement. Similarly, White argues Allen Gibbs did not prove that it was damaged by her failure to devote her entire attention and energies to the business of her employer in violation of section 1 of her employment agreement or by failing to give 14 days' notice of her termination in violation of section 2 of her agreement.

Based on our review of the record, we find substantial competent evidence upon which a reasonable jury could determine that Allen Gibbs and/or AGH Wealth were damaged as a result of these breaches. For example, Allen Gibbs and AGH Wealth presented evidence about the delays in reaching out to clients and in making other arrangements to handle their business as a result of how Ralston and White left their employment. Allen Gibbs also presented evidence that White not only worked for Ralston but also for others and that it had to replace her after she left to work for Morgan Stanley. In addition, Allen Gibbs presented evidence that before White's abrupt departure, she began copying confidential information while still employed at Allen Gibbs. Thus, based on such evidence and the reasonable inferences to be drawn from it, we conclude that it is reasonable for the jury to conclude that Allen Gibbs and/or AGH Wealth suffered damages as a result of these breaches by Ralston and White.

Ultimately, the jury found that Ralston had breached the terms of his employment agreement with Allen Gibbs and its affiliated companies by:

- failing to give 30 days' notice of his intent to terminate his employment in violation of section 2 of the employment agreement;
- taking confidential information of Allen Gibbs and/or AGH Wealth, and disclosing it to his new employer in violation of section 9 of the employment agreement;
- providing services to and/or soliciting AGH Wealth clients to become the clients of his new employer in violation of section 10.B of the employment agreement; and

23

- soliciting White to become an employee of Morgan Stanley in violation of section 10.C of the employment agreement.

The jury also determined that White had breached the terms of her employment agreement with Allen Gibbs or its affiliated companies by:

- failing to devote her entire attention and energies to her employer's business in violation of section 1 of the employment agreement;
- failing to give 14 days' notice of her intent to terminate her employment in violation of section 2 of the employment agreement; and
- taking confidential information of Allen Gibbs and/or AGH Wealth, and disclosing it to her new employer in violation of section 9 of the employment agreement.

As a result of these breaches, the jury awarded liquidated damages against Ralston and in favor of Allen Gibbs and/or AGH Wealth in the amount of $381,706.36 under the formula set forth in section 13 of his employment agreement. The jury also awarded damages against Ralston and in favor of AGH Wealth in the amount of $159,177.65 under the formula set forth in section 11. Likewise, the jury awarded liquidated damages against White and in favor of Allen Gibbs in the amount of $50,066.00 under the formula set forth in section 13 of her employment agreement.

Ralston argues that the damage awards based on sections 11 and 13 of his employment agreement are duplicative and that only the damages awarded under section 11 should be allowed to stand. However, based on our review of the record, we reject this argument. Section 11 of the employment agreement provides a formula to reimburse Allen Gibbs and its affiliates for clients lost to Ralston during the 24-month period following his termination. On the other hand, section 13 of the employment agreement provides a formula for the payment of liquidated damages for various breaches of

contract. As a result, we do not find the damage awards under these two formulas agreed upon by the parties to be duplicative, and Ralston has not challenged this part of the jury's verdict on other grounds.

In summary, we conclude that the district court did not err in presenting the breach of contract claims to the jury for decision. We also conclude that AGH Wealth was an "Employer" under the terms of Ralston's employment agreement. Furthermore, we find that the district court did not err in limiting references to the protocol in front of the jury because it was not part of the employment agreements and none of the parties to this action signed the document. Additionally, we conclude that the damages awarded by the jury under sections 11 and 13 of Ralston's employment contract are not duplicative. Finally, we conclude that the damages awarded by the jury on the breach of contract claims are supported by substantial competent evidence and are reasonable based on the damages provisions mutually agreed to by the parties in recognizing the impracticality of determining actual damages with precision.

*Conversion of Property Claims*

Ralston and White contend—for various reasons—that the jury's verdict for conversion of property should be set aside as a matter of law. "Conversion is the 'unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights.'" *Armstrong v. Bromley Quarry & Asphalt, Inc.*, 305 Kan. 16, 22, 378 P.3d 1090 (2016) (quoting *Bomhoff v. Nelnet Loan Services, Inc.*, 279 Kan. 415, 421, 109 P.3d 1241 [2005]). Since the days of Blackstone, property ownership has been defined as "dominion which one [person] claims and exercises over the external things of the world, in total exclusion of the right of any other individual in the universe." 2 William Blackstone, Commentaries *2.

25

Accordingly, to prevail on their conversion of property claim, Allen Gibbs, AGH Wealth, and Glenn needed to show that they owned the property taken; that Ralston and White assumed or exercised the right of ownership; that Ralston and White took the property without authorization; and that Ralston and White took it to the exclusion of the rights of Allen Gibbs, AGH Wealth, and Glenn. See *Bomhoff*, 279 Kan. at 421. Even if there was substantial competent evidence in the record to support the other elements to prevail on a conversion of property claim, the evidence presented at trial does not support the element of exclusivity. Rather, a review of the record reveals that Allen Gibbs, AGH Wealth, and Glenn continued to have access to the property taken.

The district court instructed the jury that Allen Gibbs, AGH Wealth, and Glenn alleged that Ralston and White "converted confidential information belonging to plaintiffs." As discussed above, the term "Confidential Information" was defined in section 9 of the employment agreements signed by Ralston and White to mean "the names, addresses, record and files of the Employer's Clients, and any information, disclosed or discerned by [Ralston and White] in consequence of employment . . . regarding the Employer's products, systems, processes and services. . . ." We find nothing in the record on appeal or in the briefs to establish that Ralston and White took any property from their former employer other than the information defined as confidential under the employment agreements. Likewise, during oral argument the plaintiffs did not identify other property that was taken.

In this case, there is no allegation that Ralston and White deleted, wiped, or hid any of the information that is the subject of the plaintiff's conversion claim. See *IBD, Inc. v. Enterprise Business Solutions, LLC*, No. 99,201, 2009 WL 929072, at *2, 5 (Kan. App. 2009) (unpublished opinion) (a showing that defendant's computer "servers were wiped to ensure that the software did not remain with the [owner's] servers" was sufficient to show that the property was taken "to the exclusion of [others]"). Instead, the evidence presented at trial showed that Ralston and White copied the confidential information and

26

left a copy of what they took with Glenn—who was an officer of Allen Gibbs—when they terminated their employment.

The evidence presented at trial also showed that the confidential information copied by Ralston and White also remained in the possession of LPL Financial and/or AGH Wealth. So, the plaintiffs had the same access to the confidential information as they had before Ralston and White left to go to work for Morgan Stanley. Although taking the confidential information without authority to do so constituted a breach of contract—and was covered by the liquidated damages provisions in the employment agreements—it does not support a separate tort claim for conversion of property.

It also appears that the language used by the district court in Instruction No. 20 magnified the problem—and likely confused the jury—about the essential elements necessary to render a verdict for conversion of property. In particular, the district court instructed the jury that the plaintiffs could prove conversion by showing that Ralston and White "[a]ppropriated the property to his or her own use; *or* Gave the property to a third party to the exclusion of the plaintiffs' rights." (Emphasis added.) By using the disjunctive "or" instead of the conjunctive "and" in Instruction No. 20, the district court reduced the essential element of exclusion to simply an optional element. As a result, Instruction No. 20 was not legally appropriate because it failed to accurately instruct the jury on the essential elements of conversion of property.

In summary, although taking and disclosing the confidential information to their new employer breached their employment agreements, Ralston and White did not exclude whatever ownership or possessory rights Allen Gibbs, AGH Wealth, and/or Glenn held in the information. See *Moeller v. Kain*, No. 98,531, 2008 WL 4416042, at *6 (Kan. App. 2008) (unpublished opinion) (copying client information from files did not exclude owner's rights and was insufficient to establish conversion claim). Without evidence to support this essential element, the plaintiffs cannot—as a matter of law—

prevail on their claim for conversion of property. Thus, the jury's verdict on the conversion claim must be set aside.

*Breach of Fiduciary Duty Claims*

Ralston and White contend that the plaintiffs could not recover under their tort theories for several reasons. Because of our decision on the conversion claim, this contention is only material to the remaining breach of fiduciary duty claims. Ralston and White argue that the plaintiffs' tort claims were preempted by the Kansas Uniform Trade Secrets Act (KUTSA), K.S.A. 60-3320 et seq. In addition, they argue that the damages awarded to the plaintiffs under the breach of contract and breach of fiduciary duty claims were duplicative. We will briefly address the preemption argument and then move on to address the duplicative damages argument.

<u>*Preemption under the KUTSA*</u>

The parties agree that the KUTSA preempts or "displaces conflicting tort, restitutionary and other law of this state providing civil remedies for misappropriation of a trade secret" but "does not affect: (1) Contractual remedies . . . (2) other civil remedies that are not based upon misappropriation of a trade secret; or (3) criminal remedies. . . ." K.S.A. 2020 Supp. 60-3326(a), (b). The question of "what is and is not a trade secret requires a fact-intensive analysis of the factors set forth in the KUTSA. . . ." Rupp and Hurt, *Analyzing a Trade Secret Case in Kansas*, 83 J.K.B.A. 28, 29 (March 2014); see also *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 402, 266 P.3d 516 (2011); *BioCore Inc. v. Khosrowshahi*, 96 F. Supp 2d. 1221, 1224 (D. Kan. 2009). If the information allegedly misappropriated is not a trade secret, there can be no violation of the KUTSA. *LendingTools.com, Inc. v. The Bankers' Bank*, No. 116,382, 2018 WL 4655902, at *7 (Kan. App. 2018) (unpublished opinion).

28

Here, we need not resolve the preemption or displacement issue because Ralston and White did not raise them in their answers, in the pretrial conference order, or in their posttrial motions. Instead, they raise the preemption issue for the first time on appeal. Although the issue of whether the plaintiffs had to elect between their tort claims and a claim under the KUTSA was presented to the district court, the issue of preemption or displacement was not raised below. Because the plaintiffs have chosen not to pursue their cross-appeal, the issue of whether the district court should have required them to make an election of remedies is not before us for resolution.

Under Kansas Supreme Court Rule 6.02(a)(5) (2021 Kan. S. Ct. R. 35), an appellant must point to the specific location in the record where an issue being appealed was raised and ruled upon. If an issue was not raised in the district court, it cannot be raised on appeal. See *Ruhland v. Elliot*, 302 Kan. 405, 417, 353 P.3d 1124 (2015). This rule is necessary because a district court cannot wrongly decide an issue never presented to it for decision. See *State v. Williams*, 275 Kan. 284, 288, 64 P.3d 353 (2003). We recognize that there are exceptions to Rule 6.02(a)(5), "including: (1) the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case [and] (2) consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights . . . .'" *In re Estate of Broderick*, 286 Kan. 1071, 1082, 191 P.3d 284 (2008).

Likewise, the Kansas Supreme Court has held that it is incumbent on a party failing to raise an issue before the district court to invoke one of the exceptions to the rule barring consideration of an issue for the first time on appeal. *State v. Williams*, 298 Kan. 1075, 1085-86, 319 P.3d 528 (2014). Here, Ralston and White fail to invoke any exception justifying our consideration of the issue of preemption under the KUTSA for the first time on appeal nor do they explain why the issue is properly before the court. See *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015). Regardless, we do not find that an exception applies under the circumstances presented in this case.

Based on our review of the record on appeal, we find that Ralston and White failed to raise the issue of preemption under the KUTSA before the district court. This is significant because—as discussed above—what is and is not a trade secret is a question of fact. It is not the role of the appellate courts to make factual findings in the first instance. Instead, our role is to review what occurred below. See *State v. Estrada-Vital*, 302 Kan. 549, 557, 356 P.3d 1058 (2015). Without a factual finding on the trade secret issue at the district court level, it is impossible for us to determine whether the plaintiffs' tort claims were preempted or displaced by the KUTSA. Thus, we decline to reach the merits of Ralston's and White's preemption arguments for the first time on appeal.

*Validity of Damage Award*

Next, Ralston and White contend that the damages awarded by the jury on the breach of fiduciary duty claims were duplicative of the damages awarded on the breach of contract claims. It is important to recognize that Ralston and White do not challenge the jury's determination that they breached their respective fiduciary duties to their former employer. As to whether there is substantial competent evidence to support a damage award, we examine the record in the light favorable to the prevailing party. See *Wolfe Electric, Inc.*, 293 Kan. at 407; see also *Dougan v. Rossville Drainage Dist.*, 270 Kan. 468, 478, 15 P.3d 338 (2000).

Where conduct could satisfy the elements of both a breach of contract and an independent tort, the tort must cause damages beyond those suffered as a result of the breach of contract. See *Diederich v. Yarnevich*, 40 Kan. App. 2d 801, 813, 196 P.3d 411 (2008). In other words, when the same conduct forms the basis for multiple causes of action for the same damages, multiple recoveries are not permitted. See *Ingram v. Howard–Needles–Tammen & Bergendoff*, 234 Kan. 289, 302-03, 672 P.2d 1083 (1983) (double recovery is not permitted for same injury based on two theories); see also *Gregory v. Carey*, 246 Kan. 504, 513-14, 791 P.2d 1329 (1990) (duplicative damage

30

award rejected where all of the alleged wrongs flowed from one act). As a result, it is incumbent upon a plaintiff to present substantial competent evidence of damages arising out of the tort claim that are in addition to those awarded for a breach of contract.

In Instruction No. 29, the district court instructed the jury that the plaintiffs claimed that Ralston and White breached their fiduciary duties by:

"1. Failing to properly protect plaintiffs' client lists and other Confidential Information;

"2. Failing to adhere to the policies and procedures *regarding the protection of Confidential Information*;

"3. Using plaintiffs' Confidential Information to create a client list to take for personal gain; or

"4. *Contacting and soliciting plaintiffs' clients to leave for a competing company* when plaintiffs had placed special trust and confidence in [them] to manage, advise and service the clients on their behalf." (Emphases added.)

The jury found that both Ralston and White had breached their fiduciary duties to the plaintiff. Then, the jury awarded $60,000 in damages against Ralston and awarded $8,000 in damages against White for breach of their respective fiduciary duties. Although the jury was asked on the verdict form whether the amount of damages it awarded on the breach of fiduciary duty claims were duplicative of the damages awarded on the conversion of property claim, it was not asked whether the damages awarded for breach of fiduciary duty were duplicative of the amount awarded on the breach of contract claims.

As addressed above, the employment agreements expressed the unambiguous mutual intent of the parties to protect confidential information and to restrict Ralston and White from competing with their former employer after their employment ended. The parties agreed that a breach of the employment agreements would "result in damage that will be impractical to determine with precision." As such, they agreed to a formula for

31

calculating liquidated damages that established "a fair approximation of damages which either party will sustain in the event of a breach of the agreement."

We find that the breach of fiduciary duty claims against Ralston and White arise out of the same acts or occurrences as the breach of contract claims. Specifically, both the fiduciary duty and contract claims arise out of the taking of confidential information from their former employer—including client lists and other data—and the solicitation of their former employer's clients to follow them to Morgan Stanley. As a result, the plaintiffs were required to present substantial competent evidence of damages to support their breach of fiduciary duty claims above and beyond the damages awarded for the breach of contract claims.

Although we appreciate the district court's attempt to make sense of the damages awarded by the jury and we agree that this is a difficult issue, we do not find based on our review of the record that the plaintiffs presented substantial competent evidence to support the jury's award on the claims of breach of fiduciary duty. Likewise, the plaintiffs did not point us to any evidence in their briefs or during oral argument supporting additional damages arising out of the breach of fiduciary claims that were not also covered by the liquidated damage provisions of the contract. Thus, we set aside the jury's verdicts as to the breach of fiduciary duty claims.

*Award of Attorney Fees*

Finally, Ralston and White contend that the district court's award of contractual attorney fees was excessive. The parties do not dispute the district court's authority to award "the costs of [this] action, including reasonable attorney fees" because Allen Gibbs and/or AGH Wealth prevailed in their claims that Ralston and White breached the terms of their respective employment agreements. Likewise, it is undisputed that the plaintiffs are not entitled to recover attorney fees on their tort claims.

When the district court has authority to grant attorney fees, we review the decision under an abuse of discretion standard. *Consolver v. Hotze*, 306 Kan. 561, 568, 395 P.3d 405 (2017). The district court has wide discretion to determine the amount and recipient of attorney fees. *In re Marriage of Strieby*, 45 Kan. App. 2d 953, 973, 255 P.3d 34 (2011). When reviewing an award of attorney fees, we do not reweigh the testimony or the evidence presented or reassess the credibility of witnesses. 45 Kan. App. 2d at 973. Rather, we are to examine the record to determine whether the district court's decision was supported by substantial competent evidence. *Westar Energy, Inc. v. Wittig*, 44 Kan. App. 2d 182, 203-04, 235 P.3d 515 (2010).

In deciding the reasonableness of an attorney fee, the court should consider the eight factors set forth in Rule 1.5(a) (2021 Kan. S. Ct. R. 327) of the Kansas Rules of Professional Conduct. See *Snider v. American Family Mut. Ins. Co.*, 297 Kan. 157, 169, 298 P.3d 1120 (2013). The district court is an expert in the area of attorney fees and can draw on its own knowledge and expertise in determining the value of services rendered. Although an appellate court is also an expert on the reasonableness of attorney fees, we are not to substitute our judgment for that of the district court on the amount of the attorney fees awarded unless it is required in the interest of justice. *Johnson v. Westhoff Sand Co.*, 281 Kan. 930, 940, 135 P.3d 1127 (2006); *State ex rel. Schmidt v. Nye*, 56 Kan. App. 2d 883, 896, 440 P.3d 585 (2019).

Because we have set aside the jury's verdict on the conversion of property and breach of fiduciary duty claims, we find it appropriate to remand this matter to the district court to reconsider the amount of attorney fees to be awarded under the terms of the employment agreements. We also find that it would be inappropriate for the district court to award Glenn any attorney fees because he was not an "Employer" under the terms of the employment agreements nor was he a party to the breach of contract claims asserted in this case.

On remand, the district court should remain mindful of the general rule that "[w]here several causes of action are joined and only some of them permit the award of attorney fees, the work on several causes must be segregated in determining an attorney fee award." *DeSpiegelaere v. Killion*, 24 Kan. App. 2d 542, 549, 947 P.2d 1039 (1997). As recognized in *DeSpiegelaere*, it is possible that causes of action may be "intertwined to the point of being inseparable." Still, the burden is on the party seeking an award of attorney fees to show the entanglement of the legal work is so great that the work performed cannot be segregated. 24 Kan. App. 2d at 549.

We have reviewed the record related to the attorney fees requested by the plaintiffs and find the hourly fees charged as well as the hours incurred to be reasonable. Moreover, Ralston and White do not dispute the hourly rates or the reasonableness of the overall time incurred by plaintiffs' counsel in pursuing the claims against them. As a result, there is no need for the district court to revisit those questions on remand. Instead, the district court should focus on awarding reasonable attorney fees based—to the extent possible to do so—on the hours explicitly attributable to the breach of contract claim. At the very least, plaintiffs' counsel should be required to make a good faith effort to properly segregate the time spent working on their breach of contract claims and the time spent working on their tort claims.

We acknowledge that time spent by an attorney preparing for and taking depositions of witnesses who possess information about both contractual and tort claims may not be easily segregated. This is not necessarily true of hours spent on legal research and preparation of motions. Usually, an attorney is able to keep sufficiently detailed time records to identify the issues involved in researching, analyzing, and drafting motions as well as supporting memoranda. We also acknowledge that it may sometimes be difficult to segregate the time spent in trial preparation and in trial based on distinct issues. At the same time, it should not be particularly difficult to segregate the time involved in drafting or arguing proposed jury instructions based on the specific claims asserted.

34

In cases such as this in which it is reasonable to foresee that there will be a claim for contractual attorney fees asserted by the prevailing parties, the attorneys should anticipate that they will likely need to segregate their time and keep appropriate time records. In the absence of contemporaneously prepared time records, an attorney may submit an affidavit with "reconstructed" estimates of the time spent on the claims on which attorney fees are recoverable. But a reviewing court should treat those estimates with special scrutiny because of the passage of time and the difficulty of precisely performing the reconstruction.

CONCLUSION

In conclusion, we affirm the jury's verdict entered against Ralston and White on the breach of contract claims. However, we reverse the jury's verdict against Ralston and White on the claims of conversion of property and breach of fiduciary duty. Finally, we vacate the award of attorney fees to the plaintiffs and remand this issue to the district court for reconsideration in light of this opinion.

Affirmed in part, reversed in part, vacated in part, and remanded with directions.